111 F.3d 1332
 46 Fed. R. Evid. Serv. 1459
 Helen E. PALMQUIST, Administratrix of the Estate of Paul
Palmquist, deceased, as Administratrix, and on her
own behalf, Plaintiff-Appellee,
v.
Mark SELVIK and Village of Bensenville, Defendants-Appellants.
 No. 96-1114.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 4, 1996.
Decided April 21, 1997.
Rehearings and Suggestions for Rehearings En Banc Denied
June 3, 1997.
 
 Judson H. Miner, Jeffrey I. Cummings (argued), Miner, Barnhill & Galland, Chicago, IL, for Plaintiff-Appellee.
 Richard T. Ryan, Mark F. Smolens (argued), Flynn, Murphy & Ryan, Chicago, IL, for Defendants-Appellants.
 Before BAUER, RIPPLE, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 In the early hours of April 23, 1990, Paul Palmquist, a resident of Bensenville, Illinois, began acting strangely. He screamed obscenities and incoherent statements, threw things in his apartment, stomped around the yard, and broke his neighbor's windows. Around 5:30 a.m. he threatened to kill the paper deliverer. She reported this to the Bensenville police, who rushed to the yard outside Palmquist's apartment to investigate. They found him there shouting wildly, brandishing a muffler pipe and a fan blade. Palmquist defied the officers' requests to calm down and drop the weapons. He told the officers they would have to kill him. When they attempted to arrest him for breaking the windows, he refused to be taken. As the officers approached Palmquist, he swung the pipe at one of them and landed a blow. After Palmquist swung at the officers again, another officer fired numerous shots. Palmquist was killed.
 
 
 2
 Palmquist's estate sued the Village of Bensenville and its police for excessive force under 42 U.S.C. § 1983, contending that they violated Palmquist's civil rights when he was shot and killed. After a month-long trial a jury found the defendants liable and awarded his estate $165,000. The defendants appeal this verdict, arguing that the district court excluded evidence that Palmquist wanted to commit "suicide by police." Among other contentions, the defendants also submit the Village should not be held liable for failure to train its officers, as the jury found. We affirm in all respects, except for the "failure to train" claim, which we direct for the Village as a matter of law.
 
 I.
 
 3
 Because the defendants challenge the district court's denial of judgment as a matter of law and seek a new trial, we view the trial evidence of the events of the morning of April 23, 1990 in the light most favorable to the party winning the verdict, the plaintiff, and make all reasonable inferences which may be drawn from that evidence in favor of Palmquist's estate. Futrell v. J.I. Case Co., 38 F.3d 342, 346 (7th Cir.1994).
 
 
 4
 Paul Palmquist was a 41-year-old former auto mechanic who lived in a basement apartment at 310 S. Miner Street in Bensenville, Illinois. He was 6'1"' tall and weighed 225 pounds. During the early hours of April 23, 1990, neighbors heard a series of disturbances: Palmquist was screaming obscenities and incoherent statements, throwing things in his apartment, stomping around the yard, and breaking glass windows. Around 5:30 a.m. Palmquist screamed at the woman who delivered newspapers for the neighborhood, threatening to "kill her" and "shoot her." She left and found a Bensenville police officer she had seen previously at a nearby restaurant. That officer, Gerald Ragusin, reported to the scene; soon Officer James Kania also arrived.
 
 
 5
 Upon arriving, the officers found Palmquist on the front lawn of his residence yelling in an incoherent manner about the Viet Cong, how he wanted the officers to "call his colonel," and how a neighbor had killed his dog. He used profanity and repeatedly stated that he wanted to be left alone. Palmquist brandished a 33 1/2-inch piece of rusty muffler pipe, with the clamps and bolts still connected to the end of the pipe, and a fan blade. Officer Ragusin began conversing with Palmquist, asking him to calm down and to drop the pipe and fan blade. Officer Kania made the same requests, but was ignored. The officers pulled their guns from their holsters, and ordered Palmquist to drop the car parts. He refused, opened up both arms exposing his chest, and asked the officers to kill him.
 
 
 6
 A neighbor, Mr. Sanchez, then approached the officers and advised them that Palmquist had just woken him by shattering the driver's door window of his car along with two windows of his home. Palmquist heard Sanchez's statements, and said he smashed the windows because Sanchez had just killed Palmquist's dog. Sanchez told the officers that Palmquist's dog had been gone for over a year. Officer Ragusin asked Sanchez if he wanted to press charges against Palmquist for criminal damage to property. Overhearing this statement, Palmquist offered to pay for the damage. Sanchez said he still wanted to press charges.
 
 
 7
 The officers then approached Palmquist and told him he was under arrest and he should drop the pipe. Once told he was under arrest, Palmquist began backing up. The officers advanced with their guns still drawn, and Palmquist retreated up the driveway while swinging at the officers with his pipe. The officers repeatedly told Palmquist to put the pipe down so they could "talk this thing out." Palmquist repeatedly told the officers they "would have to kill him", and pointed to his chest and said "you'll have to shoot me right here ... there is no way you are going to put the cuffs on me."
 
 
 8
 As Palmquist slowly retreated, Officer Kania got close enough to use his flashlight to knock the fan blade out of Palmquist's hand. In doing so, Officer Kania hit Palmquist in the forearm. Palmquist then swung the pipe again and struck Officer Kania in the shoulder. The microphone to his radio was knocked off and his shirt torn. Officer Kania suffered a bruise and a cut which did not require hospitalization. Despite being hit, Officer Kania holstered his gun to calm Palmquist down. Officer Ragusin kept his weapon out. Palmquist continued to retreat. This occurred five to seven minutes after the officers arrived at the scene.
 
 
 9
 After Palmquist hit Officer Kania with the pipe, Officer Ragusin radioed for assistance from the night commander, Sergeant Mark Selvik. Sergeant Selvik had monitored Officer Ragusin's original report, and detected the agitation and urgency in Officer Ragusin's voice in this second radio transmission. Sergeant Selvik ran to his patrol car, activated the emergency lights, and quickly drove the less than one mile from the Bensenville police station to the scene. At the time, Sergeant Selvik had been a police officer for 13 years, and a sergeant for 5 years. He had undergone extensive formal and informal training, at which he had done exceedingly well. He finished first in his class at the basic law enforcement course conducted by the University of Illinois' Police Training Institute, and received the highest written exam and range scores from the Illinois Mandatory Firearms Training program. He had also completed special courses in negotiation techniques for hostage-taking and barricaded-subject situations, and was certified to use and instruct in the use of the PR-24 police baton, a 24-inch long side-handle nightstick which can be used to shield against blows and disarm attackers. Sergeant Selvik had successfully completed the course of study at the Federal Bureau of Investigation academy in Quantico, Virginia as well.
 
 
 10
 As Sergeant Selvik exited his squad car, Officer Ragusin asked him via radio to bring a PR-24 baton. Selvik brought the baton with him, hidden behind his back, ready to be used. When Sergeant Selvik arrived, Palmquist became more agitated. Sergeant Selvik, at 5'9"' much shorter than Palmquist, found out that Mr. Sanchez wished to press charges against Palmquist, and repeatedly ordered Palmquist to put down the pipe and lie down on the ground. Palmquist ignored the warnings and continued to shout about the Viet Nam war, his colonel there, and "the FBI of the CIA." Palmquist referred to Sergeant Selvik as a "Viet Cong colonel," and repeatedly shouted that he "was not going to be taken alive" and the officers should kill him.
 
 
 11
 Sergeant Selvik then discarded the baton into a nearby bush and withdrew his service weapon, a 9 millimeter sidearm, from its holster. Palmquist stood a few feet from the side of a building. The three police officers surrounded Palmquist, preventing him from moving toward them or to either side. The officers stood 4 to 6 feet from Palmquist. Officer Ragusin then grabbed a nearby bicycle and lunged at Palmquist holding the bicycle in front of him trying to knock the pipe from Palmquist's hands. But Ragusin slipped and fell. Palmquist turned towards Ragusin and swung the pipe at him. Ragusin managed to get out of the way.
 
 
 12
 At that point, Sergeant Selvik fired 2 or 3 shots into Palmquist's thigh. Palmquist's legs buckled, he fell toward the ground, and the pipe came down to the ground as well. Accounts vary from five seconds to a minute as to how long Palmquist was on the ground. Palmquist got up using the pipe as a prop, saying to Sergeant Selvik "You only winged me--you'll have to kill me." Palmquist then lifted the pipe over his head and swung it in the direction of Sergeant Selvik. Selvik first directed his fire towards Palmquist's pipe-wielding arm, and continued to fire shots into Palmquist, finally directing his fire at Palmquist's "center mass." Palmquist was struck repeatedly by bullets fired from Selvik's weapon. Palmquist again fell to the driveway on his right side in the fetal position. When he attempted to raise up on his right forearm, Officer Kania kicked the pipe from his hand, and Officer Ragusin placed his hand on Palmquist's shoulder and told him to stay down. Sergeant Selvik immediately radioed the dispatcher for an ambulance. As Sergeant Selvik moved away, he overheard Palmquist say "I'm not finished yet." Other witnesses said Palmquist said "You finally gave me what I wanted" or "I hope this worked, I hope you shot me enough." Sergeant Selvik had fired 17 shots at Palmquist; 11 drew blood. Palmquist died as a result of these wounds. The total time that elapsed from Sergeant Selvik's arrival to the final shots was approximately five minutes. The parties do not dispute that Sergeant Selvik acted under color of state law during the incident.
 
 
 13
 Palmquist's mother sued Sergeant Selvik and the Village of Bensenville claiming that Selvik used excessive force in seizing Palmquist, as well as that the Village of Bensenville inadequately trained its police officers as to how to handle persons behaving abnormally. The parties stipulated that the magistrate judge could try this case to judgment. A month-long jury trial limited to liability took place in October 1993. The jury heard conflicting accounts of the incident from 12 eyewitnesses and 3 experts, and then found for the plaintiff. The damages portion of the trial then took place; it lasted only a day and a half. The jury awarded Mrs. Palmquist and her son's estate a total of $165,000 in damages: $500 for pain and suffering; $24,000 in lost accumulations; $5,500 in medical and funeral expenses; $100,000 for the loss of enjoyment of life; and $35,000 to Mrs. Palmquist for loss of companionship and society. The suit was filed pursuant to 42 U.S.C. § 1983. Thus, the district court had jurisdiction under 28 U.S.C. §§ 1331 & 1343(a)(3) and (4), and this court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 14
 In our consideration of this appeal, we rely on the district court record as well as the parties' submissions of briefs and appendices. Circuit Rule 28(d)(1) requires that in those briefs "[t]he statement of the facts relevant to the issues presented for review ... shall be a fair summary without argument or comment." This description does not fit the statements of facts in defendants' briefs. They do not mention numerous facts which supported the jury's verdicts on plaintiff's claims, especially those surrounding the confrontation itself. Palmquist's estate has moved to strike the defendants' statements of facts as improperly argumentative, and cited numerous omissions of testimony favorable to plaintiff, as well as at least four instances where defendants did not "give the entire story" of the testimony. Parties must be called to task for these omissions and failures to denominate contested issues of fact on which they lost. See Avitia v. Metropolitan Club of Chicago, 49 F.3d 1219, 1224 (7th Cir.1995) (warning appellants not to treat contested testimony of losing party's witnesses as facts or risk having brief stricken). Accordingly, plaintiff's motion will be granted.
 
 II.
 
 15
 Sergeant Selvik seeks a reversal of the jury's finding of excessive force and a new trial on that claim. He argues that in both the liability and damages phases of the trial the trial court improperly excluded evidence of a "death wish" by Palmquist which amounted to "suicide by police." He also claims the court improperly excluded evidence of Palmquist's alcohol and drug use and did not properly instruct the jury concerning the excessive force claim. The Village seeks a reversal on the ground that insufficient evidence supported the jury's finding that the Village failed to properly train its police officers, and asks that we enter judgment as a matter of law on that claim.
 
 
 16
 A. Exclusion of Palmquist's Character Evidence
 
 
 17
 The central inquiry of this case is whether Sergeant Selvik used excessive force in stopping Palmquist the morning of April 23, 1990. The Supreme Court has held that "[w]here, as here, an excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), and thus is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. Id. at 388, 109 S.Ct. at 1867-68. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." Id. at 396, 109 S.Ct. at 1872. This inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397, 109 S.Ct. at 1872 (citations omitted). To aid the jury in undertaking this objective inquiry, the defendants argue they should have been able to introduce character evidence of Palmquist's "motive" and "intent," especially as it pertains to Sergeant Selvik's self-defense claim. This evidence of Paul Palmquist's past, especially the events of the last days and hours of his life, provides background to this tragedy and illustrates why the parties fought so hard over its admission.
 
 
 18
 1. Excluded Palmquist character evidence.
 
 
 19
 Shortly before 1 a.m. on the morning of Palmquist's death, a police officer from the nearby Chicago suburb of Itasca spotted him driving his motorcycle, weaving from side to side. The officer stopped Palmquist, smelled a strong odor of alcohol, and observed his glassy and bloodshot eyes. Palmquist denied that he had been drinking, but after he failed a field sobriety test the officer arrested him for driving under the influence. A protective pat-down search revealed a plastic bag with 10.5 grams of marijuana. Palmquist was charged with driving under the influence, drug possession, and various traffic offenses. He was released on bond at approximately 3:30 a.m.
 
 
 20
 Palmquist returned to his Bensenville apartment, and, as one of his neighbors described, began to "howl at the moon." He screamed at himself and his next-door neighbor, imitated the "Three Stooges," talked to himself, and ranted about microwaves. Two neighbors testified he did this because "he wanted someone to call the police."
 
 
 21
 Jeff Parsons, a friend of Palmquist's, said that the day before he died, Palmquist told him he would provoke the police to kill him. When Parsons heard a radio broadcast of a shooting death, he told his wife "it must have been Palmquist," even though the radio report did not give the deceased's name. Parsons contacted the Bensenville police department to alert the officer who shot Palmquist that "he had a death wish." Another friend of Palmquist's, Ned Sigler, said that in the month before his death Palmquist's drinking had worsened and that he was upset about his job as a mechanic. Sigler said that after Palmquist lost two jobs as a mechanic, he seemed depressed, and wanted "to die." Sigler described Palmquist's drinking problem as "very serious." After Palmquist's death, Sigler called the DuPage County State's Attorney's Office to advise that he knew why Palmquist died. A third friend of Palmquist's, Fred Bernacchi, who played in a garage band with Palmquist, stated that Palmquist started a "mental unraveling" about 6 months before he died, that Palmquist drank and smoked marijuana "all the time," and that he was depressed he had no girlfriend. Bernacchi said that Palmquist was proud that despite his drinking he had never been caught for driving intoxicated, and that receiving the DUI ticket "may have been the last straw."
 
 
 22
 Michael Nahra lived below Palmquist in a first-floor apartment. He stated that he had known Palmquist for about a year, and that roughly a month before Palmquist died he told Nahra that he wanted to be shot by the police. Nahra said Palmquist told him he could not "deal with the world," he wanted to be a "hermit in the desert," and he did not like his living or working conditions. Nahra said that the evening before and morning of the shooting he heard Palmquist yelling in his apartment, shouting obscenities, walking the perimeter of the property, and throwing junk. He also heard windows breaking at the residence next door. Nahra's roommate, Charles Wolfe, who knew Palmquist for approximately 4 years, described Palmquist as a heavy drinker who appeared more depressed before his death. He said Palmquist became depressed recently about his dog's death, even more so than when he had given the dog away a year earlier, and that Palmquist said that Mr. Sanchez had killed the dog. Wolfe also was awakened by Palmquist's yelling and banging and the sound of breaking glass. Other neighbors would testify to substantially the same conduct by Palmquist in the early morning of April 23, 1990.
 
 
 23
 2. Magistrate judge's rulings.
 
 
 24
 Initially, the magistrate judge granted in part and denied in part the plaintiff's motion to bar this character evidence about Palmquist, relying on the general rule excluding such evidence, Fed.R.Evid. 404. His ruling allowed the introduction of evidence of Palmquist's arrest the previous evening for DUI and marijuana possession, but excluded other testimony about his use of drugs or alcohol. In another, broader ruling, the magistrate judge denied plaintiff's motion in limine to bar the defendants from introducing evidence as to Palmquist's motive and intent. He ruled that they may present the "suicide by police" evidence as "first aggressor" evidence under Fed.R.Evid. 404(a)(2)-one of the exceptions to that rule's prohibition against character evidence. The magistrate judge later clarified this order by stating that the character evidence may be introduced in applying the "objective reasonableness" standard to determine the totality of the circumstances surrounding the seizure. Thus, the magistrate judge permitted the "death wish" evidence for the limited purpose of corroborating or rebutting the testimony of occurrence witnesses, and permitted cautionary instructions that the "death wish" evidence is irrelevant to the issue of whether or not the force used was reasonable or excessive.
 
 
 25
 The plaintiff's counsel later moved to reconsider this ruling. Just before trial, the magistrate judge entertained oral argument on the motion and entered an order based on Sherrod v. Berry, 856 F.2d 802 (7th Cir.1988) (en banc), granting the motion to reconsider and barring the defendants from presenting evidence of Palmquist's arrest for marijuana possession, his intoxication, and most importantly, excluding evidence of any "death wish" for "suicide by police." Relying on Sherrod, the magistrate judge limited the defense's evidence to the officers' personal knowledge--their experiences and observations--during the morning in question. Sergeant Selvik did not know Palmquist's motivation and intent when he shot him, the magistrate judge reasoned, and thus the evidence had no bearing on whether Selvik acted reasonably. This effectively barred the above-described testimony by Palmquist's friends and neighbors regarding his depression and desire to commit "suicide by police," as well as that he had been arrested for driving while intoxicated while in possession of marijuana a few hours before the shooting.
 
 
 26
 The defendants dispute this ruling. To them, this character evidence of Palmquist's "motive" and "intent" would allow them to present a self-defense claim, to demonstrate that Palmquist was attempting to commit "suicide by police," and to show that Palmquist's conduct was the sole proximate cause of his being shot. The defendants wanted this evidence admitted to show that Palmquist intended, even planned, the way he died.
 
 
 27
 3. Analysis.
 
 
 28
 "The appellant carries a heavy burden in challenging a trial court's evidentiary rulings on appeal because a reviewing court gives special deference to the evidentiary rulings of the trial court." Klonowski v. Int'l Armament Corp., 17 F.3d 992, 995 (7th Cir.1994) (quoting Ross v. Black & Decker, Inc., 977 F.2d 1178, 1183 (7th Cir.1992), cert. denied, 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993)). Under the applicable standard of review, abuse of discretion, reversal is warranted "only when the trial judge's 'decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous'." Wheeler v. Sims, 951 F.2d 796, 802 (7th Cir.1992) (quoting Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 563-64 (7th Cir.1984)). Further, "[n]o error in either the admission or exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. Disturbing the judgment of the district court on evidentiary grounds is necessary only if an erroneous ruling had a "substantial influence over the jury." United States v. Fairman, 707 F.2d 936, 941 (7th Cir.1983).
 
 
 29
 Sherrod states the law in this circuit: when considering a charge of excessive force under the Fourth Amendment, evidence outside the time frame of the shooting is irrelevant and prejudicial. In Sherrod, a police officer approached a robbery suspect's car from behind. After the suspect made a quick movement toward his coat, the officer shot him dead. 856 F.2d at 803. The trial court admitted evidence that the deceased was unarmed when shot. The officer challenged this ruling on appeal. This court, sitting en banc, agreed with the officer:
 
 
 30
 Knowledge of facts and circumstances gained after the fact ... has no place in the ... jury's post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise, ... the jury would possess more information than the officer possessed when he made the crucial decision. Thus, we are convinced that the objective reasonableness standard ... requires that [the officer's] liability be determined exclusively upon an examination and weighting of the information [the officer] possessed immediately prior to and at the very moment he fired the fatal shot. The reception of evidence or any information beyond that which [the officer] had and reasonably believed at the time he fired his revolver is improper, irrelevant and prejudicial to the determination of whether [the officer] acted reasonably 'under the circumstances.'
 
 
 31
 856 F.2d at 805. Likewise, in Wallace v. Mulholland, 957 F.2d 333 (7th Cir.1992), also a civil rights action alleging that police officers used excessive force, this court affirmed the inadmissibility of evidence about the general nature of a plaintiff's schizophrenia and of the likelihood that such a person would act aggressively, because the evidence would have shifted the focus from the plaintiff's actions to his condition. 957 F.2d at 336. The prejudice to the plaintiff would have outweighed the probative value to the officers, this court ruled:
 
 
 32
 Such evidence, together with evidence about [the decedent's] specific actions in the past, would have overemphasized the likelihood that [the decedent] acted in a manner that justified the officers' reaction.
 
 
 33
 Id. In Wallace, we relied upon Rascon v. Hardiman, 803 F.2d 269 (7th Cir.1986), yet another civil rights action alleging use of excessive force by a state actor, in which we affirmed the decision not to receive evidence of the decedent's mental health history. 803 F.2d at 278. In Rascon, the authorities argued that testimony that they were aware of a suicide attempt by the decedent and his history of mental illness would have helped to justify their actions in subduing the decedent, which led to his death. Id. We affirmed the trial court's exclusion of this evidence; to rule otherwise would have allowed the jury to conclude it would be reasonable to subdue the decedent based on supposed status, rather than his conduct at the time. As we stated in Wallace:
 
 
 34
 The lesson of Rascon is the danger that a jury will conclude that a mentally deficient plaintiff, regardless of his actual behavior, somehow "asked for" mistreatment at the hands of the two policemen is greater than the value of such evidence to explain the police officers' use of force.
 
 
 35
 957 F.2d at 336.
 
 
 36
 The rule of Sherrod applies both ways. In the original opinion it excluded evidence which could have been damaging to Berry, the shooting officer. Here the exclusion arguably works against the police by rendering inadmissible one explanation for the events of April 23, 1990. The magistrate judge correctly relied on Sherrod and its circumscription of admissible evidence. The excluded evidence would have shifted the jury's attention from Palmquist's behavior at the scene, which is material in judging the objective reasonableness of Sergeant Selvik's use of force, to information not possessed by Selvik, such as Palmquist's mental state and his physical behavior before the encounter. As we ruled in Wallace and Rascon, evidence relating to the plaintiff's mental and emotional state and past actions is not admissible in judging the use of excessive force. Because the excluded evidence in this case occurred outside the presence of the police, they had no personal knowledge of it.
 
 
 37
 In these circumstances, the magistrate judge properly applied the rule of Sherrod. Federal Rule of Evidence 404(a) precludes admission of evidence of a person's character "for the purpose of proving action in conformity therewith on a particular occasion." Subsection (a)(2) of that rule permits criminal defendants to offer evidence of their victim's character. This exception expressly applies only to criminal cases. But certain courts have found that when the central issue involved in a civil case is by its nature criminal, the civil defendant may invoke the exception. See, e.g., Carson v. Polley, 689 F.2d 562, 575-76 (5th Cir.1982) (exceptions apply in § 1983 action). For purposes of analysis (and as the plaintiff agrees), we can presume that this exception could apply to an excessive force case such as this. The defendants assert that under Fed.R.Evid. 404(a)(2) this type of evidence should be admitted. To defendants, Palmquist's "death wish" is evidence of a "pertinent character trait of a victim." They argue that Rule 404(a)(2) provides that character evidence is admissible to permit the trier of fact to infer that Palmquist acted on this specific occasion in conformity with his (possibly suicidal) character trait. They claim its purpose is not to provide insight into the reasonableness of Selvik's own thought processes.[1]
 
 
 38
 Even if this evidence were admissible under Rule 404(a)(2), Rule 405 provides that character could be proved through evidence of specific instances only if his character was an essential element of the self-defense claim. The "death wish" evidence does not go to an essential element of Selvik's self-defense claim, but is rather purely circumstantial. Ultimately, the evidence of Palmquist's desire to commit "suicide by police" does not tend to make the existence of any fact material to the "objective reasonableness" test more or less probable. Selvik knew nothing of this pre-existing condition and behavior when he first encountered Palmquist in the yard. Thus, these facts could not have entered into Selvik's determination on whether or not to shoot or how many times. The jury needed to know what Selvik knew and saw when he fired the weapon. Hindsight should not have influenced the jury's determination any more than it should have ratified Selvik's response to the situation. Therefore, the district court did not abuse its discretion in excluding the evidence. At issue is the objective reasonableness of Selvik's actions at the time of the seizure, see Lester v. City of Chicago, 830 F.2d 706, 711 (7th Cir.1987), not the victim's reasons. This excludes information not within Selvik's personal knowledge at the time of the shooting.
 
 
 39
 Strongly buttressing this conclusion is the fact that Sergeant Selvik was allowed to present evidence of his experience and observations during the morning encounter. This included Palmquist's swinging the pipe at him, ignoring the officers' warnings, and even asking the officers to shoot and kill him. The trial record contained Palmquist's statement to the officers after he was shot that "I hope this worked--this is what I wanted you to do." The jury also heard Palmquist's repeated statements that the police would have to shoot or kill him. Also admitted was extensive testimony from both sides' expert witnesses concerning "suicide by police." The jury heard one expert witness testify that this was "a classic case of suicide by police." The defendants' counsel in opening statement and closing argument referred to this case as "about suicide by police." Although additional evidence may have confirmed this opinion, and the number and type of different factors the defendants wanted considered was not as complete as they would have liked, the jury clearly heard it. Further, the relatively modest amount of damages awarded the plaintiff implies the jury gave weight to this evidence. Because there was substantial evidence admitted with respect to this theory, further "character" evidence along this line would have been cumulative. See Holmes v. Elgin, Joliet & Eastern Ry. Co., 18 F.3d 1393, 1397 (7th Cir.1994) ("Admission of cumulative evidence does not merit reversal absent a showing of prejudice.") (citing Stutzman v. CRST, Inc., 997 F.2d 291, 298 (7th Cir.1993)).
 
 
 40
 The exclusion of the evidence that Palmquist was arrested the night before his death for driving under the influence and marijuana possession presents a closer question. Consistent with Sherrod, the jury heard testimony from three witnesses, including Sergeant Selvik, who observed Palmquist during the incident and speculated he was intoxicated. Trial witnesses testified that Palmquist's actions revealed directly and by reasonable inference that intoxicants affected his conduct at and before the shooting. The magistrate judge could have allowed in the pre-seizure evidence of intoxication and possession of marijuana, if not necessarily the arrest. See Saladino v. Winkler, 609 F.2d 1211, 1214 (7th Cir.1979) (in action against police officer for excessive force, evidence of plaintiff's intoxication admissible under Fed.R.Evid. 403 because it "tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life."). The exclusion of this "foundational" or "background" alcohol/drug evidence--specification of the amount of alcohol and marijuana in his body, as well as his possession of marijuana--could be viewed as cumulative, or at least its exclusion harmless error. After all, the jury did hear three witnesses called by the defense testify that Palmquist was "high" or "drunk." Given our deference to the district court on determinations such as these, we reject defendants' request for a reversal solely on this ground.[2]
 
 B. Damages Phase
 
 41
 The defendants assert that the magistrate judge exacerbated the mistake of not admitting evidence of Palmquist's motive and intent by excluding this same evidence during the damages phase of the trial. This resulted in an unfair trial, they assert, as anticipation of allowing this evidence in during the damages phase was the reason for bifurcating the trial in the first place.
 
 
 42
 Unlike the analysis of admission of this character evidence during the liability phase, a more persuasive argument can be made for its admission during the damages phase. Evidence that Palmquist wanted the police to kill him is directly relevant to his life expectancy. Exclusion of this evidence could have had a highly prejudicial impact on the jury's ultimate award to the plaintiff of $165,000. Indeed, the trial was bifurcated to reduce likelihood of this prejudice during the jury's consideration of liability. Statements that Palmquist wanted to die certainly affected how long he would be expected to live, and thus what amount of money to award his mother and his estate.
 
 
 43
 Unfortunately for the defendants, they failed to fully argue this point. "Issues must be argued to be preserved." Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1430 (7th Cir.1986) (citing Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir.1984) (argument presented in perfunctory and underdeveloped manner not considered)). Defense counsel preserved the argument by objecting to the exclusion of this evidence before the damages phase began. But in their principal, 50-page brief, the defendants devote a single paragraph to this error. They do not even mention, much less expand on this argument in their reply brief. And given the opportunity to do so through questioning at oral argument, defendants' counsel did not advance reasons for reversal on this point. Even an issue expressly presented for resolution is waived if not developed. Bonds v. Coca-Cola Co., 806 F.2d 1324, 1328 (7th Cir.1986) (citing Hunter). This could have been a potent argument for the defendants, but they have not sufficiently discussed this point to warrant its resolution. Accordingly, it cannot be considered.
 
 C. Jury Instructions
 
 44
 The defendants also claim they were denied a fair trial because the district court improperly instructed the jury on the excessive force claim. The key decision for the jury was whether Selvik acted reasonably under the circumstances that existed immediately before and at the moment he fired his weapon. Throughout the trial, defense counsel objected to the admission of evidence about "alternative" options or strategies the Bensenville police could have employed in the moments before Selvik shot Palmquist. They wished to expressly limit consideration of this evidence to the "lack of training" claim against the Village, and exclude it from consideration on the excessive force claim. The defendants claim error in the trial court's failure to give such a limiting instruction. They also criticize the court's decision not to give two other instructions defendants proposed that would limit the jury's consideration of evidence of the reasonableness of Sergeant Selvik's conduct to the time of the incident.
 
 
 45
 When defendants' counsel promulgated the limiting instruction at issue, a lengthy colloquy ensued, and a decision was made not to instruct the jury then, but that an opportunity would be provided for such an instruction. At the close of evidence, the magistrate judge spoke with counsel twice regarding the instructions, but defendants' counsel never renewed their request for this limiting instruction. Thus, the defendants waived their right to challenge the district court's decision not to give the proposed limiting instruction. See Varhol v. Nat'l R.R. Passenger Corp., 909 F.2d 1557, 1567-68 (7th Cir.1990) (en banc) (party should remind judge at proper time to give limiting instruction).
 
 
 46
 Perhaps the defendants could have challenged the underlying reasons given by the district court for giving or not giving certain instructions. But "[i]t is impossible to evaluate the challenge-sometimes impossible even to understand it--without knowing why the district court acted as it did." In the Matter of Galvan, 92 F.3d 582 (7th Cir.1996) (citing Hill v. Porter Mem. Hosp., 90 F.3d 220, 225-26 (7th Cir.1996)). Contrary to Circuit Rule 30(b)(5), the defendants' appendix fails to include the applicable portions of the transcript where the trial court discussed the rationale for its rulings or instructions. We are left to guess as to the court's reasoning. This court "can hardly decide whether a judge has abused his discretion without knowing why he exercised it as he did." Urso v. United States, 72 F.3d 59, 62 (7th Cir.1995). On this alternative ground as well, the defendants waived their objections to the jury instructions.
 
 
 47
 Even if the defendants had not waived their objections to the instructions, we would conclude the district court accurately set out the law to be applied to the facts in this case. With regard to the central inquiry of this case, the trial court instructed the jury:
 
 
 48
 to determine whether Mark Selvik had a reasonable belief that deadly force was necessary to prevent death or great bodily harm to himself or another when he fired his weapon initially at Paul Palmquist as well as when he fired it later.
 
 
 49
 This instruction tracks Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1871-73, 104 L.Ed.2d 443 (1989), the Supreme Court's most recent pronouncement on excessive force. It properly set forth the Fourth Amendment's "objective reasonableness" standard for a claim that law enforcement officials used excessive force, deadly or not, in the course of an arrest. See Wilson v. Williams, 83 F.3d 870, 873-74, 876 (7th Cir.1996) (in civil rights suit trial court did not err in instructing jury that to be excessive, force had to be objectively unreasonable in light of facts and circumstances confronting officer). The instructions given properly focused the jury's inquiry; thus on this point we affirm.
 
 D. Inadequate Training Claim
 
 50
 The defendants' final dispute on appeal is with the jury's finding that the Village of Bensenville was deliberately indifferent to the training of its police officers. They argue that under the restrictive law of municipal liability under § 1983 for a constitutional omission such as "failure to train," and given the evidence at trial, this claim should have been dismissed because it cannot be maintained under the controlling law. See Fed.R.Civ.P. 50(a)(1). A federal standard of review governs the determination of a motion for judgment as a matter of law. "We must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists 'any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed.' In applying this standard, our review is de novo." Deimer v. Cincinnati Sub-Zero Prods., Inc., 58 F.3d 341, 343-44 (7th Cir.1995) (citations omitted).
 
 
 51
 Strict constraints limit municipal liability under 42 U.S.C. § 1983. In Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978), the Supreme Court expressly restricted such liability to cases in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." A plaintiff seeking to find a municipality liable under § 1983 must establish a causal nexus between his injury and the municipality's alleged policy or custom. Id. at 693-94, 98 S.Ct. at 2037-38. "Otherwise, we would risk creating de facto respondeat superior liability, which is contrary to Monell." Cornfield By Lewis v. Consolidated High School Dist. No. 230, 991 F.2d 1316, 1327 (7th Cir.1993) (citing Monell, 436 U.S. at 693-94, 98 S.Ct. at 2037-38).
 
 
 52
 In City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court reiterated that a municipality may, in restricted circumstances, be held liable under § 1983 for constitutional violations resulting from its failure to train its police officers. Id. at 387, 109 S.Ct. at 1203-04. But the Court well circumscribed its holding: "The inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388, 109 S.Ct. at 1204 (footnote omitted). "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.... To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983." Id. at 391, 109 S.Ct. at 1206.
 
 
 53
 Thus, "[a]n allegation of 'failure to train' is available only in limited circumstances." Cornfield, 991 F.2d at 1327. To prevail on such a claim, the estate had to show that Bensenville failed to train its police officers in a "relevant respect," and that the failure to train evidences a deliberate indifference to its citizens' rights. Id. (citing City of Canton, 489 U.S. at 389, 109 S.Ct. at 1205). In City of Canton, the Supreme Court elucidated this standard:
 
 
 54
 Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality--a "policy" as defined by our prior cases--can a city be liable for such a failure under § 1983. Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.... [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it causes injury.
 
 
 55
 Id. at 389-90, 109 S.Ct. at 1205 (footnotes omitted). In Cornfield, this court added to this understanding:
 
 
 56
 In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular omission that is likely to result in constitutional violations.
 
 
 57
 991 F.2d at 1327. On a number of points, the evidence at the trial in this case does not satisfy this rigid legal framework.
 
 
 58
 First, the estate had to show the Village failed to train its police officers in a relevant respect. The estate contends the jury could have concluded Bensenville provided no training in handling abnormally behaving persons based on the testimony of the Village's police chief at the time in question, Chief Toomey. He testified that Bensenville did not require its officers to be trained in this area in addition to that received in "basic" police training. The jury also heard testimony from the arresting officers, who could not recall the training they received in this respect.
 
 
 59
 The Village's training program cannot be deemed deficient so easily, however. In determining the adequacy of training, the focus must be on the program, not whether particular officers were adequately trained. City of Canton, 489 U.S. at 390-91, 109 S.Ct. at 1205-06. The estate's argument boils down to "no special training = deficient training." We cannot accept this equation. To do so would ignore the training the officers did receive. Chief Toomey testified that the basic recruit police training included a block of instruction on handling people who act abnormally, and mandatory post-academy and in-service training included scenarios involving abnormal behavior. It is against these "better or more" training scenarios that the Court warned in City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."). To conclude otherwise would be to subject all municipalities which employ police officers who attended either of the only two Illinois police training institutes to liability for "inadequate" training in handling abnormally behaving individuals.[3] This would include every police officer outside of Chicago and the Illinois state police. See Erwin v. County of Manitowoc, 872 F.2d 1292, 1298 (7th Cir.1989) (plaintiffs cannot prevail merely by proving that injury could have been avoided had officer received enhanced training forestalling particular conduct resulting in injury). We point out that no evidence was admitted in this case, from expert witnesses or otherwise, that Illinois state standards for training police in handling abnormal behavior are in any way deficient under the Federal Constitution.[4]
 
 
 60
 Even if Bensenville were somehow deficient in providing its officers proper police training, the estate had to demonstrate how the failure to provide specific training had a causal nexus with the claimed injury. "[F]or liability to attach ... the identified deficiency in the city's training program must be closely related to the ultimate injury." City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206. On this point, the estate offered expert witness Clemmons, who testified that the officers' failure to gather information about Palmquist, their failure to contain and control the situation, and their decision not to drag out the encounter as long as possible (to increase the chance of peaceful resolution) "played a substantial role in the outcome of this incident." But Clemmons did not testify to inadequate training. In fact, he testified he did not know what training Bensenville's officers received. That Bensenville did not have supplemental training in handling abnormally behaving persons does not render its training deficient. At oral argument, plaintiff's counsel admitted there is no record evidence the police standards in this area have in any way evolved since 1975 when Sergeant Selvik trained.
 
 
 61
 "[T]he requisite causal connection between such a policy and the constitutional injuries complained of" must be tighter than Clemmons' testimony. Leahy v. Board of Trustees of Comm. Coll. Dist. No. 508, Cook Cty. Ill., 912 F.2d 917, 922 (7th Cir.1990) (footnote omitted). Clemmons' testimony went to what training the Village could have provided to prevent this occurrence, which is a far cry from proving the actual training was constitutionally deficient. Cf. Erwin, 872 F.2d at 1298. At trial, the plaintiff offered no expert testimony which questioned the adequacy of a municipal police department's procedures. Thus, there was no evidence that the training was constitutionally deficient. In fact, plaintiff's counsel repeatedly advised the court that its experts did not offer testimony about the training which had been received by Sergeant Selvik and the other Bensenville officers. The plaintiff must demonstrate that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206. Yet the estate presented no proof that a "deficiency in training actually caused the police officers' indifference to" Palmquist. Id.
 
 
 62
 Nor did the estate provide any evidence that the officers' training was a proximate cause to Palmquist's death. When Sergeant Selvik fired 17 shots at Palmquist the morning of April 23, 1990, he acted alone--separately from the Village of Bensenville and the training it provided its police officers. No connection exists between decisions by municipal policymakers and Palmquist's death. This causation requirement must be closely guarded. As the Court stated in City of Canton, any lesser standard of proof would permit § 1983 plaintiffs to interpose municipal liability on a de facto respondeat superior basis, proscribed since Monell. 489 U.S. at 387, 109 S.Ct. at 1204.
 
 
 63
 Moreover, "[f]or the § 1983 failure in training to constitute actionable 'policy,' this failure to train must reflect deliberate or conscious choice." Erwin, 872 F.2d at 1298 (citing City of Canton). The constitutional violation here, as in City of Canton, was committed by a non-policymaking official, Sergeant Selvik. Further, like City of Canton, this case does not involve an explicit village action or policy that violates constitutional rights. See Graham v. Sauk Prairie Police Comm'n, 915 F.2d 1085, 1100 (7th Cir.1990) (same). Thus, before liability can legally attach, the municipality must be on notice of the deficiency, and have a "high degree of culpability." See Cornfield, 991 F.2d at 1327. The question then is whether the police training the Village of Bensenville afforded the officers it hired was obviously deficient with respect to handling abnormally behaving individuals. If so, was this inadequacy so likely to result in a violation of a constitutional magnitude that a jury could reasonably attribute to the municipality's policymakers deliberate indifference to these training needs? There was no testimony that any Village policymakers were aware of the need for training for the Village police force on the handling of abnormally behaving citizens. Indeed, the record contains no evidence of actions by individuals with decisionmaking authority recognizing a need for this training and remaining "deliberately indifferent" to that need. Nor is there evidence of inaction by such individuals to other instances of excessive force used in handling abnormally behaving criminal suspects. The estate did not show a pattern of constitutional violations constituting notice that a training deficiency existed. Without a showing of such deficiencies along with an awareness of them by the Village government, there is insufficient evidence on which to ground municipal liability.
 
 
 64
 In Hirsch v. Burke, 40 F.3d 900 (7th Cir.1994), the Indianapolis police were sued for civil rights violations when they arrested and jailed a man for public intoxication when in fact he was diabetic and in a state of insulin shock. Id. at 901. One of the plaintiff's theories of liability was the city's failure to train its officers to recognize and distinguish the symptoms of diabetes from intoxication, and that this failure resulted in the violation of the plaintiff's civil rights. Id. at 904. In Hirsch, this court affirmed the district court's dismissal of this claim for the same lack of evidence from which this case suffers: no proof indicating past incidents of the city's police making the same mistake, and nothing indicating that the police had engaged in a pattern of such mistakes. "In short, there is absolutely nothing in this record to show that the defendants were on notice of any constitutional violations, much less that they were deliberately indifferent to them." Id. at 905. See also Graham, 915 F.2d at 1102 (merely because plaintiff could point to something city could have done to prevent hiring of police officer who shot arrestee did not mean that procedures actually undertaken by city in investigating officer's background before hiring amounted to deliberate indifference to citizens' rights so as to provide basis for civil rights liability of municipality when applicant, after being hired, shot and killed arrestee); Dowdell v. Chapman, 930 F.Supp. 533, 546 (M.D.Ala.1996) (town's policies or lack thereof did not constitute deliberate indifference on failure to train theory in action arising from deputies' fatal shooting of allegedly mentally ill individual).
 
 
 65
 The single incident at issue in this case does not make a lack of training so obvious, and any inadequacy therein so likely to result in the violation of constitutional rights, that the Village elders can reasonably be said to have been deliberately indifferent to a purported need. We cannot conclude from the evidence at trial that the omission evidences " 'a deliberate choice to follow a course of action ... from among various alternatives' by city policymakers." City of Canton, 489 U.S. at 389, 109 S.Ct. at 1205 (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 1300-01, 89 L.Ed.2d 452 (1986) (plurality)); Erwin, 872 F.2d at 1298. Upon the evidence in this case, the jury could not have found that the Bensenville policymakers had actual or constructive notice that a particular omission in its police officers' training existed which was likely to result in constitutional violations. See Cornfield, 991 F.2d at 1327. Given the state of the trial evidence, the "failure to train" claim should not have gone to the jury. On this record, as a matter of law, Palmquist's estate has not established municipal liability under § 1983 based on inadequate training.[5]
 
 III.
 
 66
 This case involved a hard-fought trial with numerous difficult issues. The defendants mounted a broad attack on appeal, but we conclude that the district court's only reversible error was allowing the plaintiff's "failure to train" claim to go to the jury. Pursuant to City of Canton, the Village of Bensenville is entitled to judgment as a matter of law on that count.
 
 
 67
 The plaintiff's motion to strike defendants' statements of facts in their principal and reply briefs as improperly argumentative and thus in violation of Circuit Rule 28(d)(1) is GRANTED. Pursuant to Sherrod v. Berry we AFFIRM the district court's exclusion of Palmquist's character evidence, AFFIRM its exclusion of the alcohol and drug evidence as cumulative or as harmless error, AFFIRM the court's instructions to the jury, and thus AFFIRM the jury's liability finding for the plaintiff. We also AFFIRM the award of damages because of the defendants' failure to provide sufficient argument for retrial on this issue. We REVERSE the finding of municipal liability on the "failure to train" claim, and enter judgment for the defendants on that claim.
 
 
 68
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 69
 RIPPLE, Circuit Judge, concurring in part and dissenting in part.
 
 
 70
 I agree that the judgment against Sergeant Selvik must stand. I respectfully do not concur, however, with my colleagues that the jury in this case was unreasonable as a matter of law in imposing liability on the Village of Bensenville.
 
 1.
 
 71
 Although I concur with my colleagues' disposition of the judgment against Sergeant Selvik, I respectfully disagree with their rationale with respect to the admission of pre-seizure evidence. The majority relies on Sherrod v. Berry, 856 F.2d 802 (7th Cir.1988) (en banc) to hold that Mr. Palmquist's past statements and conduct are inadmissible. In Sherrod, this court, sitting en banc, held that the reasonableness of a police officer's fatal response must be examined solely in light of the information the officer possessed at the crucial moment of the incident. That proposition in turn led to the conclusion that evidence that the victim of a police shooting was unarmed when shot is irrelevant, prejudicial and inadmissible. Judge Cummings dissented. In his view, with which I agreed, see 856 F.2d at 808 (Ripple, J., concurring), "the evidence that Sherrod was unarmed [was] relevant as part of the testimony helping the jury understand the type of movement Sherrod made that precipitated his death.... The manner in which Sherrod reached into his pocket is of great consequence to the determination of the action--it was this movement that caused Berry to shoot and kill him." 856 F.2d at 810 (Cummings, J., dissenting).
 
 
 72
 Today the court applies Sherrod to make it more difficult for a police officer to defend himself against an excessive force claim. See generally Sherrod, 856 F.2d at 809 n. 2 (Cummings, J., dissenting) (predicting the future "havoc" Sherrod will cause police officers trying to establish that they acted in self-defense). Police officers, charged with protecting the citizenry in an increasingly dangerous environment, should not be prohibited from offering evidence that is obviously relevant to the reasonableness of their decision to use deadly force. The evidence proffered in this case is probative of the situation Sergeant Selvik faced at the crucial moment (under Sherrod) that he fired the fatal shots: Mr. Palmquist's prior expressions of his desire to die at the hands of the police make it more likely that his physical behavior at the scene that night was sufficiently aggressive to create a reasonable belief in Sergeant Selvik's mind that deadly force was necessary. The majority's formalistic application of Sherrod, by which it absolutely forbids the admission of this powerfully relevant evidence, makes little sense. Indeed, my colleagues are unwilling, understandably, to live with the logical consequences of their holding: After presenting Sherrod as a per se rule that excludes all evidence that does not occur in the officer's presence, the court promptly contradicts itself by stating that the magistrate judge could have allowed in preseizure evidence of Mr. Palmquist's intoxication and marijuana possession because, the court reasons (citing a case predating Sherrod), intoxication "tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life." Ante, at 1342 (quoting Saladino v. Winkler, 609 F.2d 1211, 1214 (7th Cir.1979)); accord Turner v. White, 980 F.2d 1180, 1182-83 (8th Cir.1992) (citing Saladino and holding that trial court did not abuse discretion in allowing in evidence of intoxication as it was relevant to jury's assessment of situation that officer confronted). Yet if pre-seizure evidence of intoxication is admissible to show that Mr. Palmquist acted as the officer claimed, then preseizure evidence of his fixed desire to commit suicide by police should be admissible to show the same. The majority's characterization of Mr. Palmquist's mental state, demonstrated by his prior statements and behavior, as "character" evidence is simply unrealistic. See generally 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5233.[1] This mischaracterization and the resulting inconsistency will confuse even further this area of the law.
 
 
 73
 In my view, we need to adopt a more flexible approach to the admissibility of pre-seizure evidence, an approach that recognizes that some evidence may be so probative (and not unduly prejudicial) that it is permissible to admit it to prove the nature of the situation faced by the officer at the time the shot was fired. We need to leave this matter in the hands of the trial judiciary and allow it to make common-sense judgments as to the admissibility of this evidence. Indeed, in Sherrod, as in this case, we were purportedly applying an abuse of discretion standard of review. Likewise, in Wallace v. Mulholland, 957 F.2d 333, 336 (7th Cir.1992) and Rascon v. Hardiman, 803 F.2d 269, 278 (7th Cir.1986), two cases cited by the majority, we applied an abuse of discretion standard to affirm the trial courts' decision to exclude similar evidence.
 
 
 74
 Although I differ with my colleagues on their rigid approach to this evidence, I nevertheless would affirm the trial court's decision in this case. Despite the exclusion, the jury nevertheless heard substantial evidence supporting the defense's theory that Mr. Palmquist desired to commit suicide by police. The excluded evidence would not have produced a different result in this case. I respectfully submit that this case underlines the need for a more flexible approach to the admission of pre-seizure evidence and, consequently, for more reliance on the capacity of the trial court to determine whether the evidence ought to be admitted.
 
 2.
 
 75
 I respectfully part company from the majority insofar as it holds that liability cannot attach to the Village of Bensenville. Neither party, nor the majority, suggests that the instructions given to the jury misstated the law of municipal liability, as set forth in City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Nevertheless, the majority reverses the jury's determination that the facts as presented at trial satisfied the Canton requirements. In so doing, the majority suggests that the only basis for imposing such liability is the municipal defendant's neglect of its training procedures in the face of a pattern of constitutional violations. This, however, is decidedly not the law. In Canton, the Supreme Court of the United States made clear that "pattern" evidence was but one method of establishing municipal liability. A jury can impose municipal liability, despite the lack of "pattern" evidence, if it finds that an obvious training need was neglected and caused the plaintiff's death:
 
 
 76
 But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
 
 
 77
 489 U.S. at 390, 109 S.Ct. at 1205 (footnotes omitted).[2] I agree with the magistrate judge that, viewing the evidence in the light most favorable to the plaintiff, "the trial record provides overwhelming evidentiary support for the jury's verdict." Order at 2. The jury heard that the Village did not require its officers to have any training whatsoever in dealing with persons behaving in an abnormal or irrational manner. Indeed, the jury had the opportunity to hear the three officers at the scene admit that they either did not have or could not recall having any such training. The evidence at trial further demonstrated that it was a normal and frequent occurrence (up to 40% of the work done or 6,400 complaints per year) for the Village's police officers to have to deal with persons acting in an abnormal manner. In addition, a fair reading of the plaintiff's expert testimony establishes that the Village's lack of training resulted in the inability to cope competently with Mr. Palmquist, thereby causing Sergeant Selvik's use of excessive force. The expert further testified that the need to train police officers on how to confront irrational individuals is obvious and that such training is accepted police practice.[3] The deliberate indifference claim was bolstered by evidence that the individual responsible for police training in the Village did not even know the content of the officers' training courses. I am convinced from my review of the record, viewing the evidence as required in the light most favorable to the plaintiff, that the jury could have concluded that the Village was deliberately indifferent to the need for "more or different training," id. at 390, 109 S.Ct. at 1205, in "a relevant respect," id. at 389, 109 S.Ct. at 1205. See Russo v. City of Cincinnati, 953 F.2d 1036, 1046-47 (6th Cir.1992) (reversing summary judgment on failure to train claim and citing as grounds the frequency with which the police officers confronted disturbed individuals, the officers' inability to give specific responses as to the content of their training, and expert testimony regarding the adequacy of city's training); Zuchel v. City & County of Denver, 997 F.2d 730 (10th Cir.1993) (affirming denial of judgment notwithstanding the verdict because evidence showed that (1) officer unconstitutionally used deadly force; (2) the use of force arose in usual and recurring situation with which police officers must deal; (3) there was a causal link between the use of force and inadequate training; and (4) the failure to train demonstrated deliberate indifference).
 
 
 78
 The majority instead undertakes to reweigh the evidence, citing testimony that basic police training includes a block of instruction on handling situations involving abnormal behavior. The jury had ample reason to reject this testimony and must have agreed with the plaintiff's expert that the officers' training was inadequate. The majority also asserts that the jury could not have determined that Mr. Palmquist's death was caused by the Village's inadequate training, but the plaintiff's expert established a reasonable causal chain: The Village did not train on how to deal with irrational individuals, and the officers improperly dealt with the irrationally behaving Mr. Palmquist, thereby causing his death. Cf. Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 93 n. 6 (1st Cir.1994) (stating that failure to train did not cause assault because there was no evidence that the officers improperly approached mentally handicapped victim, improperly attempted to calm him, or assaulted him because of their lack of knowing how to deal with such a person).[4] We must not second-guess the jury with respect to its determinations of both contested fact and credibility.
 
 
 79
 Most importantly, "in light of the duties assigned to" Sergeant Selvik, Canton, 489 U.S. at 390, 109 S.Ct. at 1205-06, the jury's determination that the Village shoulder responsibility is especially warranted. The line officers in this case called the sergeant because they needed supervisory assistance in dealing with the difficult situation confronting them. Instead of taking charge of the scene upon arrival, Sergeant Selvik shot and killed Mr. Palmquist within two minutes and fifteen seconds of his arrival. The Village's police infrastructure did not allow for an appropriate command response to the problem, notwithstanding the line officers' attempt to get command assistance once they discovered they could not handle the situation alone. The Village was obligated to train its command structure to respond to these situations in an appropriate fashion. Accordingly, I would not second-guess the jury's determination and would let the judgment stand.
 
 
 
 [1]
 The concurrence in part/dissent in part to this case disagrees that Palmquist's previous statements and behavior constitutes character evidence. Post at 33. This is an argument even the defendants have not made. Throughout this case, they have referred to this "death wish" evidence as a "pertinent character trait of a victim." Indeed, the defendants' central argument on appeal is that the jury should have been permitted to infer that Palmquist acted on this specific occasion in conformity with his possibly suicidal tendencies
 
 
 [2]
 Our colleague in his concurrence in part/dissent in part indicates that it is somehow contradictory to affirm the admission of this alcohol and drug evidence as well as the exclusion of the "death wish" evidence under Sherrod. Post at 33. Evidence was admitted in each of these two categories. Ultimately, it is the amount of the evidence, not its nature, that the defendants and our colleague dispute in each instance. For this reason we find no conflict in the magistrate judge's rulings, much less that he abused his discretion in making them
 
 
 [3]
 Rather, the evidence demonstrated that Bensenville did its best to secure proper training for its police officers. Indeed, Sergeant Selvik must qualify as one of the most highly trained officers on the street; his credentials outpaced even those of plaintiff's expert witness, James Clemmons, an instructor at the Chicago Police Academy
 
 
 [4]
 This is one factor among many distinguishing this case from Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir.1992), in which a paranoid schizophrenic was fatally shot by police officers, where such expert testimony was received. Id. at 1046-47
 
 
 [5]
 We reject defendants' request to "link" the excessive force and failure to train claims such that reversal of the latter requires a new trial on the former. Defendants dropped their request for a limiting instruction, as discussed supra at II.C., waiving the argument that evidence on the failure to train claim improperly affected the jury's consideration of the excessive force allegation. Because the record evidence supporting the excessive force claim is strong, the "inconsistent with substantial justice" standard of Fed.R.Civ.P. 61 is not close to being satisfied in this case
 
 
 [1]
 In her brief, the plaintiff acknowledged that "Paul's wish or desire to die is not part of [Mr. Palmquist's] 'character.' " Appellee's Br. at 25
 
 
 [2]
 Id. at 390 n. 10, 109 S.Ct. at 1205 n. 10 ("[T]he need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.") (internal citation omitted); see also id. at 396-97, 109 S.Ct. at 1208-09 (O'Connor, concurring in part and dissenting in part) (noting that "it could be shown that the need for training was obvious in one of two ways")
 
 
 [3]
 The Chicago Police Department has had such training since at least 1977 and provides refresher courses on the subject to its officers
 
 
 [4]
 The majority faults the plaintiff for not calling into doubt the "actual training" provided by the Village or, phrased another way, the "training which had been received" by the officers. Ante, at 1345-46. In the process, my colleagues suggest that a plaintiff, who happens to find no problem in any of the training actually received by the officers, cannot prove "deficient" training by demonstrating that additional training should have been given in a particular area. Ante, at 1345-46. The Supreme Court, though, has said clearly that a deficiency in training can be proved by showing a need for "more or different training." Canton, 489 U.S. at 390, 109 S.Ct. at 1205 (emphasis added). Indeed, the majority's reasoning suggests that a complete "lack" of training cannot constitute "deficient" training. Under the majority's approach, a municipality could escape deadly force liability by providing absolutely no training on the use of deadly force. In such a case, the plaintiff would not be able to point to any "deficiency" in the training that was actually given. I am convinced that the majority's approach conflicts with controlling Supreme Court precedent. See Canton, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10 ("failure" to "train officers in the constitutional limitations on the use of deadly force ... could properly be characterized as 'deliberate indifference' to constitutional rights") (emphasis added). My view is that the plaintiff in this case proved a "deficiency" in the Village's training program: the lack of any training whatsoever on dealing with abnormal behavior. As I have noted earlier, the evidence of record permitted the jury to arrive at its verdict on that factual premise