UNITED STATES of America, Appellee,

v.

Chris BUCHANAN, Appellant.

No. 92–1983.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1992.

Decided Feb. 16, 1993.

Rehearing Denied April 7, 1993.

Gregory G. Fenlon, St. Louis, MO, argued, for appellant.

Dorothy Lear McMurtry, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before FAGG, Circuit Judge, BRIGHT, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Chris Buchanan appeals convictions for conspiring to possess cocaine with intent to distribute, attempting to possess with intent to distribute 500 or more grams of cocaine, and knowingly and intentionally possessing cocaine. He asserts that the evidence was insufficient to support the convictions and raises objections to the sentence that he received.

The district court[1] sentenced Buchanan to concurrent sentences of 210 months and to four years of supervised release on each count and fined him on each count. Because Buchanan has challenged the sufficiency of the evidence, we set out such facts as the evidence would support a reasonable jury in believing.

I.

Six specific events furnished the substance of the trial. The first was on August 24, 1988, when a Federal Express package from Los Angeles was delivered in St. Louis. The package had been intercepted as suspicious and a narcotics-detection dog had reacted positively to it. DEA agents notified agents in St. Louis, and the package was intercepted and found to con-

---

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

tain two kilograms of cocaine, most of which was removed before the package was delivered to the stated address. The package was addressed to Michelle Jackson, but Buchanan accepted and signed for it. During and after this incident, agents provided surveillance on various relevant premises. A few minutes after the delivery, agents executed a federal search warrant at the apartment to which the package was delivered and found a loaded .38 firearm under a couch and the open package, but no drugs. Buchanan was not at the apartment, but he was spotted at that time exiting the rear door of the building searched and entering a second building with another man. Although it was August, the second man was wearing a heavy coat and appeared to be hiding something under it. Agents therefore acquired a search warrant for the second building, and executed it approximately an hour and a half later. Five people were apprehended inside an apartment in this second building, and agents found Buchanan's photograph and nine ID cards in his name, two pagers, a nine-millimeter semi-automatic weapon, a twelve-gauge shotgun, and Federal Express air bills and overnight mail receipts that bore the Lynwood, California, return address of the original cocaine package. The receipts were quite recent and coincided with one another in date and alternate address. Buchanan had also signed for one of those packages.

When the controlled delivery was made, Buchanan was paying rent on both apartments at issue. He also admitted to having a third apartment. He had telephones at each apartment, mobile phones for both his Blazer and his Jaguar, and seven leased pagers with "group call" capability. Records revealed that approximately 400 telephone calls per month were made between residences and cars, as well as to California.

The next incident of importance occurred on September 13, 1988, when agents intercepted two packages being sent from California to St. Louis. The sender and both recipients had the same surnames as individuals apprehended in the second apartment on August 24. The packages each contained more than a kilogram of cocaine. The courier carrying the packages was driving a car registered to a Lynwood, California address, and a Lynwood address was found on a Western Union money transfer receipt in the car. That Lynwood address was the same as the address on the August delivery.

On December 12, 1988, a St. Louis police detective recognized Buchanan, rushing to board a flight to Los Angeles. He produced an airline ticket in another name, then consented to a search of his locked briefcase. In the briefcase was $920 in loose cash and a brown paper bag containing another $20,000 in cash. Buchanan told the officer that he had received the money from his father's estate when his father died. The government determined, however, that his father had actually died eight months previous. His father's estate, moreover, showed an inventory of over $5,000 less than Buchanan was carrying upon arrest.

On January 31, 1989, agents seized Buchanan's Chevrolet Blazer because they believed he had bought it with the proceeds of drug dealings. Evidence was introduced that Buchanan had purchased the Blazer for approximately $17,000 with two cashier's checks in August of 1988, even though he had been unemployed since November of 1987. When he was recalled to work in September of 1988, he had voluntarily quit his job at the General Motors plant. In addition, the government introduced evidence regarding several bank accounts that Buchanan had containing approximately $24,000. When Buchanan's Blazer was searched, the officers found one bag containing 2.01 grams of cocaine and another containing 2.36 grams of cocaine base under the driver's seat, and a pager and safety deposit key were in the car. The deposit box records revealed that Buchanan had entered the box on two occasions coinciding with the mailing of packages to California.

Another event of relevance was the November 29, 1990, search at Buchanan's residence, pursuant to a search warrant. Before the agents searched the residence, Buchanan arrived with another man and

agents found that Buchanan was carrying two bags of cocaine totalling 2.27 grams, at which time he was arrested. In searching his dwelling, agents seized a loaded nine millimeter weapon, test tubes containing cocaine residue, and hundreds of small plastic baggies from a bedroom dresser.

The next event of importance occurred on November 30, 1990, when a Kansas City DEA police officer approached and questioned a man exiting a train from Los Angeles. The man's two train tickets, which showed a continuing trip to St. Louis, bore a name different from his identification card, which also revealed a Lynwood, California, address. During a consensual search of the man's luggage, officers found a 499.4 gram brick of cocaine packaged in a sealed detergent box. Upon finding the cocaine, the police arrested the man and notified St. Louis that a cocaine shipment destined for St. Louis had been seized. A police decoy posed as the drug courier and completed the trip to St. Louis. Two men in a van remained in the St. Louis train station parking lot until most passengers had departed. One then made a telephone call and the police officer heard him say, "The guy didn't show up with the stuff." The police approached the two men, and ascertained that one man, Richard Wright, was from Lynwood, California, and had flown to St. Louis the day before. Wright had Buchanan's telephone number in his pocket and telephoned Buchanan from the police station while police recorded the calls. The calls contained conversation regarding return calls on pagers, references to others known to the police, and Buchanan's request for one ounce. Buchanan was also recorded as saying he was scared but that, "I got a lot of people askin' for things, you know?"

On March 15, 1991, Buchanan called Special Agent Terry Bohan of the Alcohol, Tobacco, and Firearms office, who had arrested Buchanan in November of 1990. Buchanan identified himself and asked if it was too late to help himself. He requested a meeting with Bohan but did not appear for it. He later called Special Agent Bohan again and met with him. At that time, he identified three men for Agent Bohan and

discussed which men handled two-kilo quantities and who worked for whom. Buchanan stated that he knew this information because he had worked for the distributor in the past. Buchanan also discussed the men arrested at the train station and their relationships to the distributor, saying that he was to have picked them up and arranged for an apartment for them. Buchanan agreed to meet with agents again but never did. The only further contact with him was through his attorneys.

## II.

On appeal, Buchanan raises eight points: (A) whether there was sufficient evidence to support a verdict finding him guilty of conspiracy; (B) whether there was sufficient evidence to sustain a conviction for attempted possession with intent to distribute; (C) whether there was sufficient evidence that he engaged in distribution of cocaine and, as a matter of law, whether 2.27 grams was a sufficient amount to support an inference of intent to distribute; (D) whether a *Franks* hearing should have been held and whether the evidence and fruits obtained from the second search should have been suppressed, on the asserted ground that the sworn statements in the affidavit supporting the warrant were untrue; (E) whether it was error to admit the taped recordings of telephone conversations between the defendant and Richard Wright; (F) whether the government denied Buchanan due process of law, equal protection, and a fair trial by employing unlawful ex parte discovery techniques; (G) whether the base offense level upon which the sentence was based should be reduced two points because of an error as to the amount of cocaine seized on September 13, 1988; and (H) whether the sentence should be reduced.

## A.

For his first argument, Buchanan addresses the sufficiency of the evidence to support the jury's conviction on Count I, which charged a conspiracy contrary to 21 U.S.C. § 841(a)(1), a statute prohibiting a

person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Buchanan argues that there was no evidence that he chose to participate in the alleged conspiracy.

 It is well settled that the government may prove essential elements of a crime by direct and circumstantial evidence. *United States v. Brown*, 948 F.2d 1076 (8th Cir.1991). In a challenge to the sufficiency of evidence in a criminal case, the court must review the evidence in the light most favorable to the government, and the government is to be given the benefit of all reasonable inferences that could be drawn from the evidence. *United States v. Young*, 634 F.2d 1136, 1138 (8th Cir.1980). This court will reverse, moreover, only if it concludes that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements. *United States v. Wint, et al.*, 974 F.2d 961, 968 (8th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1001, 122 L.Ed.2d 151.

Buchanan acknowledged in his brief on appeal:

> There is no question that the evidence proved that the occupants of 4024 Beechwood were drug dealers, and that Sidney and Wright were conspirators. Defendant, however, was not shown to be anything other than an innocent bystander in the first delivery, was not involved in any way with the second delivery, and was merely a potential small quantity customer in the third delivery ...
>
> A conspiracy had been proven. There is a weak question as to whether defendant was shown to have actual knowledge of it. But there was no evidence whatsoever that defendant voluntarily participated in it.

Appellant's Brief at 25–26.

Unfortunately for Buchanan, however, the jury found that sufficient evidence of Buchanan's participation did exist.

 Once a conspiracy has been proved, even slight evidence connecting a defendant to the conspiracy is sufficient to support his conviction. *United States v. Tallman, et al.*, 952 F.2d 164, 167 (8th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 2319, 119 L.Ed.2d 237 (1992). Evidence such as Buchanan's receipt of the cocaine delivery, his direct link to both apartments and the correspondence directed to the California address, his apprehension en route to Los Angeles while carrying a great sum of cash with no satisfactory explanation for it, his cash purchases of two automobiles and various pagers and mobile phones and $24,000 bank accounts, despite alleged unemployment, his cocaine possession, both on his person and in his residence, and the recorded telephone conversations between Buchanan and a courier in which Buchanan asks for an ounce and states that he has people "askin' for things," are clearly incriminating facts. Buchanan also implicated himself by contacting a government agent and identifying men with whom he admitted working, explaining that he had worked for the distributor in the past, as well as acknowledging contact with the men who had made the recorded telephone calls. After reviewing the evidence, it is fair to state that a rational jury could well have found that Buchanan was a co-conspirator. Therefore, we affirm on the first issue.

**B.**

 Buchanan's second argument is similar. He claims that there was insufficient evidence to support the jury verdict finding him guilty of attempted possession of cocaine with intent to distribute it. To prove this charge, the Government must prove (a) intent to engage in criminal conduct and (b) conduct constituting a "substantial step" towards the commission of the substantive offense that strongly corroborates the actor's criminal intent. *United States v. Watson*, 953 F.2d 406 (8th Cir.1992). Intent to distribute may be proved by either direct or circumstantial evidence. *United States v. Brett et al.*, 872 F.2d 1365, 1370 (8th Cir.1989), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989).

■ Buchanan argues that these elements have not been proved because he maintains that he was an innocent party who merely signed for the first controlled delivery. He notes that he was not in the apartment when the search warrant was executed and argues that there is no proof that he knew the contents of the package or caused them to disappear. But the warrant was executed within ten minutes of the delivery, and that fact, in conjunction with other evidence at trial, could have caused a reasonable jury to believe that Buchanan took the cocaine with him when he left the apartment. Other relevant evidence was that agents spotted him leaving the apartment at the time the search warrant was executed, and there was testimony that he was accompanied by a suspicious man in a heavy coat. His identification was found in the second apartment, along with weapons and pagers and the coinciding express mail receipts to the California return address of the cocaine shipment. Buchanan was also paying rent on both dwellings and telephone records showed over 400 calls per month between the two residences and California. In addition, the paraphernalia, pagers, mail receipts, telephone records, weapons, and drugs found on Buchanan were evidence that the jury could have relied upon in convicting. Buchanan was arrested carrying more than $20,000 in cash onto a Los Angeles-bound flight, and he purchased a $17,000 Blazer with cash while he was unemployed. The presence of a large sum of unexplained cash in connection with other evidence of drug trading is probative of the previous occurrence of drug transactions, and the presence of a firearm may be considered a tool of the drug dealers' trade and, therefore, evidence of intent to distribute. *Brett* at 1370 (citations omitted).

Because it cannot be said that the jury verdict was unreasonable after considering the evidence as a whole, we affirm on the second issue.

### C.

■ Buchanan argues as his third point that he did not possess a large enough quantity of cocaine to support an inference of intent to distribute. Buchanan was charged in Count III pursuant to 21 U.S.C. § 841(a)(1), a statute that does not specify a minimum quantity necessary for conviction. There are, therefore, numerous cases that hold that drug quantity is not an element of the substantive offense of possession with intent to distribute.

■ We have stated that intent to distribute a controlled substance may be established by circumstantial evidence, including possession of a large quantity of controlled substance, and that proof of possession of a small amount of controlled substance, standing alone, is an insufficient basis from which to infer intent to distribute. *United States v. Eng*, 753 F.2d 683, 687 (8th Cir.1985). The court believes, however, that the totality of the direct and circumstantial evidence is sufficient to uphold Buchanan's conviction on this count. For instance, the jury could have considered that Buchanan accepted the original two-kilogram cocaine delivery and rented the apartment to which the cocaine came. There was ample evidence of a buy-and-sell operation due to Buchanan's "group-call" pagers, weapons, mobile phones, large sums of cash, possession of cocaine, and his admitted work with a distributor in the past. We therefore affirm on this issue.

### D.

For his fourth argument on appeal, Buchanan claims that a *Franks* hearing should have been held and that the evidence and fruits obtained from the second search should have been suppressed. He asserts that the second warrant was issued as a result of sworn statements that were untrue when made. The so-called *"Franks* hearing" takes its name from *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a case in which the Supreme Court held that there is a presumption of validity with respect to an affidavit that supports a search warrant. The Court also held, however, that when the defendant makes a substantial preliminary showing that a statement known to be false, or one made with reckless disregard

of its truth, was included in an affidavit, then the Fourth Amendment requires that a hearing be held to determine whether the allegedly false statement was necessary to the finding of probable cause.

Buchanan alleges that statements in the affidavit were intentional lies or were made in reckless disregard for the truth. The portion of the affidavit at issue stated:

"Immediately prior to the execution of this search warrant and a brief time after the above-described package had been delivered to the [Ventura] apartment, *surveilling agents and task force officers observed a black male exit Apartment # 1 at 9562 Ventura and go directly to Apartment # 2 at 9569 Jacobi,* a short distance away where he has remained to the present time. When the surveilling officers observed this individual, he was wearing heavy, winter-type coat although the outside temperature was approximately 85 degrees. *No other individuals entered or left the apartment at Ventura between the time the above-described package was delivered and the execution of the above-described search warrant."* (Emphasis added.)

Buchanan asserts that the italicized portions of the affidavit are false. He argues that an occupant of an apartment in that complex may observe people enter and leave through one of the exits of an adjoining apartment but not both exits. Buchanan argues that Detective Williams was the only surveillance officer who testified, and therefore, if Williams could not see a black male exiting Apartment # 1 at 9562 Ventura, then the allegation must be false. The government responds that Detective Williams was only one of several surveillance officers present at the complex, and that Buchanan is mistaken in his assumption that no one could see the apartment in question simply because Williams could not.

■ The government claims, therefore, that Buchanan is mistaken that the affidavit statements are false. This court has required a defendant to offer proof of the affiant's recklessness or deliberate false-hood before a *Franks* hearing is necessary. *See, e.g., United States v. Keeper,* 977 F.2d 1238 (8th Cir.1992). A detective testified at the suppression hearing in the present case that he gathered the information at the apartments from agents and officers and by radio. The detective stated that he could not be certain which officer gave him the information, but that he believed it to be true and correct at the time he transmitted it to the affiant, a special agent who was, in turn, receiving the information at the courthouse. The district court credited this testimony and denied the hearing request, and we are in no position to hold that it was clearly erroneous to do so. Based upon the totality of the evidence bearing on the request for the search warrant, we see no error in the denial of a *Franks* hearing.

### E.

Buchanan asserts as his fifth argument that the court erred in admitting into evidence the taped recordings of telephone conversations between Richard Wright and Buchanan. He argues that no foundation was laid for admitting the tapes and that the officer testified "merely" that the recording was consensual.

■ This court has recognized seven matters that must be proved in order to admit tape recordings into evidence. *See United States v. Willis,* 774 F.2d 258 n. 1 (8th Cir.1985). Those matters are:

1. The recording device was capable of taking the conversation now offered into evidence;

2. The operator of the device was competent;

3. The recording is authentic and correct;

4. No changes, additions, or deletions have been made;

5. The recording has been preserved in a manner shown to the court;

6. The speakers are identified; and

7. The conversation elicited was made voluntarily and in good faith, without any type of inducement.

Buchanan asserts that Sgt. Terry James established only two of the seven requirements when he testified. He argues that the government failed to satisfy requirement Nos. 1, 3, 4, and 5 and only partially satisfied No. 7. Buchanan's argument focuses upon the fact that Wright was not produced at trial. Buchanan does not give direct evidence of any inducement, but argues that Wright must have received inducement to make the telephone calls to Buchanan.

The government responds that the recording device was clearly capable of recording conversations because the tape recording exists. (Requirement 1). It further argues that its agents established authenticity and correctness by testifying that they listened to the recordings as they were being taped and again later and by vouching for their authenticity. (Requirement 3). The government next argues that no changes, additions, or deletions were made (Requirement 4), because an agent testified to that effect and there was no contrary evidence. The government asserts, too, that it proved the recording was properly preserved, as required by Requirement 5, because an agent testified that he initialed the recording and that it was kept in the evidence storage area. The government cites *United States v. McCowan*, 706 F.2d 863 (8th Cir.1983), in which this court found that a district court may assume that public officials with custody of evidence will properly perform their duty and will not tamper with the evidence. Finally, the government contends that it offered proof of Requirement 7 through the agent who testified that Wright consented to the recording of the conversations and that Wright placed the telephone call from the St. Louis Police Department.

Having carefully examined the record, we agree with the arguments of the government. We note that while Buchanan argues that Wright was induced, he fails to produce any evidence whatsoever to that effect or to refute the evidence presented by the government. Buchanan's argument on this point is frivolous.

### F.

For his sixth argument, Buchanan claims that the government denied him due process of law, equal protection of the law, and a fair trial, by resorting to congressionally-prohibited acts in ex parte discovery. Specifically, he asserts that the government used discovery techniques that violated the Right to Financial Privacy Act, 12 U.S.C. § 3401 et seq. That statutory scheme provides that no government authority can gain access to a financial institution's customer records unless the customer has authorized it, and the records are disclosed pursuant to an administrative subpoena or summons, a search warrant, or a judicial subpoena, or in response to a formal written request.

Buchanan contends that the government obtained his records by way of administrative subpoena without his knowledge or consent, in violation of 12 U.S.C. § 3405. He acknowledges, and the government strenuously argues, that there is authority that an incidental violation of the Right to Financial Privacy Act will not require suppression of evidence. *United States v. Frazin*, 780 F.2d 1461 (9th Cir.1986), *cert. denied*, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986). Buchanan maintains, however, that his case should be an exception to that rule, if it is a rule, because the violation here was neither accidental nor occasional. Instead, he argues, there was repeated intentional intrusion in violation of his rights.

After a careful review of the transcripts of the proceedings below, we affirm on this issue for reasons other than the ones that the government advances. In the hearing on pretrial motions, Buchanan's counsel questioned the use of administrative subpoenas during cross-examination of a government agent, and the questioning provided evidence that the subpoenas had been used to procure documents Buchanan now asserts were protected. Although Buchanan questioned the agent regarding use of the subpoena, however, he never raised a specific objection to that procedure, nor did he move to suppress the evidence generated by it. It was not until the actual trial

**1380**

that Buchanan objected to the use of the documents as having been illegally obtained. Even then, he made no mention of the Right to Financial Privacy Act, relying entirely on what appears to be due process and equal protection arguments.

■ A defendant who believes that evidence has been illegally obtained must make a motion to suppress it before trial, or the objection is deemed to be waived. Fed.R.Crim.P. 12(b), (f); *United States v. Johnson*, 614 F.2d 622 (8th Cir.1980) (*per curiam*). We therefore refuse to consider this aspect of Buchanan's appeal.

### G.

■ Buchanan argues next that his base offense level (BOL) was incorrectly calculated because it was based on a total amount of 2,313.5 grams of cocaine instead of 2,085.9 grams of cocaine, the latter being the amount that the parties stipulated that a government chemist would testify to if called as a witness for sentencing purposes. (Buchanan maintains that his counsel did not notice the error until a sentencing transcript was reviewed.) He asserts that, had this latter amount been employed in calculating the guidelines, his BOL would have been 30 rather than 32 and his guideline range would have changed from 210–262 months to 168–210 months.

There are two large difficulties with this argument, even if we overlook, for the moment, under the auspices of the plain error rule, the fact that defense counsel did not raise this issue below. First, it is clear that the trial judge in fact used a BOL of 30, because, after adjusting the sentence upward five points, he arrived at an offense level of 35. (*Allonge* to PSR, fourth unnumbered page.) Second, the trial judge, in denying the significance of a motion to reduce the BOL from 32 to 30, stated that "a sentence of 210 months would be appropriate in this case [and therefore] it is a moot point as to whether the first offense level should be 30 or 32." (*Id.*, second unnumbered page.) Under these circumstances, since it is plain that the sentencing judge would have sentenced the defendant to 210 months even if the

stipulation had been accepted as the truth, any error was harmless. *See Williams v. United States*, 503 U.S. ——, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

### H.

Buchanan raises a number of objections to the sentence that he received. He asserts that the district court erred in enhancing his sentence because he was a manager or supervisor of criminal activity involving five or more participants (U.S.S.G. § 3B1.1(b)); in relying on cocaine seizures on August 24, 1988, and November 30, 1990, as relevant conduct, because they were too unconnected to be counted as relating to a continuing enterprise (U.S.S.G. § 3D1.2); and in enhancing his sentence for possessing a weapon in connection with a drug offense (U.S.S.G. § 2D.1(b)(1). We have examined the record and find no findings of fact that are clearly erroneous, or any errors of law, that bear on these matters.

■ Finally, Buchanan argues that his sentence should have been adjusted downward in return for information provided to the government. There was no agreement between the parties that the government would recommend a downward departure for Buchanan if he would provide information. In fact, Buchanan does not assert that such an agreement existed; he only states that such a departure should be given to a cooperating defendant. Absent agreement, there was no obligation by the government to move for a downward departure. The district court may not depart downward absent a motion by the government. 18 U.S.C.A. § 3553; *United States v. Rudolph*, 970 F.2d 467, 470 (8th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1023, 122 L.Ed.2d 169. We therefore affirm the district court on this issue.

### III.

For the reasons given at length, the court below is affirmed in all respects.