UNITED STATES of America,
Plaintiff–Appellee,

v.

Timothy L. JOHNSON, Defendant–
Appellant.

No. 96–4040.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1997.

Decided Feb. 27, 1998.

Major R. Coleman (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Kathleen T. Zellner, Douglas Johnson (argued), Zellner & Associates, Naperville, IL, for Defendant–Appellant.

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This is a run-of-the-mill drug case. Our opinion breaks no new ground, to say the least. Even the case name reflects the mundane nature of this appeal: A search of Seventh Circuit cases revealed over 50 cases entitled either *United States v. Johnson* or *Johnson v. United States*. The most recent of the *United States v. Johnsons*, decided this past October, dealt with facts remarkably similar to ours—a cocaine dealer convicted on drug charges and for being a felon in possession of a firearm. *See United States v. Johnson*, 127 F.3d 625 (7th Cir. 1997).

The Mr. Johnson in this case, Timothy L. Johnson, came to the attention of the Indianapolis police courtesy of Milton Phillips, a police informant. Phillips knew Johnson for 18 years before turning him in to the authorities as a drug dealer. Initially Phillips alerted Detective Jeffrey Poikey of the Indianapolis Metropolitan Drug Task Force to Johnson's activities; later, Phillips agreed to serve as an undercover operative. In December of 1994 and January of 1995 Phillips agreed to conduct controlled purchases of cocaine from Johnson. To arrange these purchases Phillips contacted Johnson by pager. The Indianapolis police supplied Phillips with money to purchase cocaine, wired Phillips for sound, and conducted close surveil-

lance of Phillips meeting with Johnson to make the purchases.

Phillips made purchases on December 11, 1994, and January 15, 1995. In December Johnson sold Phillips 12.4 grams of cocaine base for $450. In January he sold Phillips 27.9 grams of 75 percent pure cocaine for $800. During a phone conversation leading up to the January deal Johnson bragged that he supplied cocaine to two local drug dealers, Keith and Julio. He also expressed some reluctance to drive to meet Phillips—not because of a guilty conscience, but because he worried about driving around with so much cocaine in his car as he had five other customers waiting to buy cocaine that day.

The police not only set up the controlled buys from Johnson, they also rounded up his associate, Michelle Taylor, who happens to be Johnson's wife's cousin. Facing charges herself, Taylor agreed to cooperate and, apparently, provided the rest of the story: Johnson and Taylor began to work together after Taylor asked Johnson's wife if Tim needed someplace to store his cocaine. He did, and he agreed to pay Taylor's rent in exchange for the use of her apartment for storage and processing. Johnson kept his cocaine in a ziplock freezer bag under a dresser in Taylor's bedroom. He brought cocaine to her residence on a daily basis—at least 16 kilos from November 1994 to January 15, 1995. During this period Johnson brought other associates to Taylor's apartment: Reynard Williams, who rented cars for Johnson, and Tony Smith (a.k.a. Tony Jamison), who helped Johnson cook the cocaine.

Most importantly, Taylor acted as the intermediary between Johnson and her boyfriend, Eugene Strader, for at least two cocaine transactions. She arranged a third, but her arrest prevented its completion. In all, Strader bought significant quantities of Johnson's cocaine from Taylor. (Taylor, however, told the police and several of her relatives that the cocaine belonged to Strader.) Strader and Johnson never seem to have met; they conducted business through Taylor. Ironically, Taylor "broke off with" Strader and "took up with" Johnson on January, 18, 1995—the same day the police searched Taylor's apartment and Johnson's place.

The most important Johnson–Taylor–Strader deal went down in January of 1995. Taylor arranged for Strader to purchase 6 ounces of cocaine for $6,500. Strader met Taylor in the parking lot outside her apartment, he gave her the cash in a brown paper bag, she took the money inside to Johnson and Smith who were cooking cocaine, Johnson gave her a ziplock bag with 6 ounces of powder in it, and Taylor returned to the parking lot where she gave the cocaine to Strader, who complained that it looked like it had a lot of cut in it. Taylor relayed Strader's grievance to Johnson, who replied, "It's all good." Taylor passed that reassurance on to Strader, who then departed. Later that night Strader called Taylor to renew his protest. Taylor again talked with Johnson, who promised to make it up to Strader on the next deal. Taylor's efforts as go-between netted her $200 from Johnson. Strader, meanwhile, testified for the government at Johnson's trial.

When the police searched Taylor's apartment they found 9 ounces of cocaine, a digital scale, a bottle of cutting agent (Inositol), and a white-powder-coated, glass measuring cup and glass beaker. Perhaps the rest of the cocaine ended up in the trash: Taylor's sister testified that Johnson cooked cocaine at her residence and that, upon her arrest, Taylor called and told her to get rid of a green duffle bag, which the sister tossed into a dumpster.

The police arrested Johnson at his apartment. Before leaving the apartment for the police station, Johnson confessed. He explained that on and off for 5 or 6 years he sold cocaine purchased from Joe Velajoe in Salt Lake City. He told the cops that he bought 1 to 2 kilos at a time for $20,000 to $25,000 per kilo. Johnson informed the officers that he used the aliases of Mark Kline and Gerald Bean. Johnson led the police to $13,660 in cash in his nightstand. And he gave the police a 9 mm pistol he had purchased. The police also found 2 pagers, 5 cellular phones, a cocaine-coated glass beaker, and a scale.

Later in January Johnson and his attorney at that time, John M. Moses, met with Detective Poikey. Johnson and Moses characterize this meeting as part of their plea negotiations with Marion County authorities. Poikey contends that Johnson merely cooperated in hopes of gaining favorable treatment. In any event, Johnson named names: he said he bought the cutting agent from Tony Jamison (a.k.a. Tony Smith) from Chicago, he explained that Bianca Bean supplied him with an ID belonging to her husband (Gerald), and that he bought the Kline ID from someone known as "G-man."

Johnson, it seems, will not be the poster boy for rehabilitation: In 1993 a Kansas Highway Patrol trooper stopped him for a traffic violation. A lengthy discussion led Johnson to agree to a search that revealed a half pound of cocaine in the trunk and a stolen 9 mm pistol under the driver's seat. When police attempted to arrest Johnson he started a fight—which ended with Johnson handcuffed and under arrest. All this resulted in a Kansas conviction for possession of cocaine.

Taylor, it seems, will not be the poster girl for fidelity to boyfriends: At Johnson's trial, two of Taylor's cousins testified that she told them that all the cocaine belonged to Strader. These two also testified that Taylor lied—habitually. A third cousin testified that Taylor said that the drugs belonged to Strader. According to this cousin, Taylor admitted that she pinned the drugs on Johnson because the police told her she would go to jail if she didn't cooperate. Taylor's aunt testified that Taylor said the drugs were Strader's and that the police pressured her to cooperate or else face 9 years in jail.

In any event, Johnson's case moved slowly through the criminal justice system. Apparently Indiana initially charged Johnson; but eventually the feds took control of the prosecution. He went to trial in September of 1996. Despite the credibility problems with Taylor's testimony, the jury found Johnson guilty of conspiracy to distribute and possession with intent to distribute cocaine. It also concluded that Johnson was guilty of being a felon in possession of a handgun. Johnson received concurrent sentences of 300 months on the drug charges and 120 months on the gun count.

Johnson raises virtually every challenge in the book on this appeal: insufficient evidence for conspiracy and possession, erroneous admission of evidence about the controlled buys, erroneous admission of evidence of Johnson's arrest in Kansas, erroneous admission of statements made during the course of alleged plea negotiations, and ineffective assistance of counsel. While we do believe that the trial court erred by admitting too much evidence of events in Kansas, none of the challenges Johnson mounts merit reversal of his conviction.

■ First, Johnson contends that the jury lacked sufficient evidence to find him guilty of conspiracy to distribute cocaine. The government argued that Johnson conspired with Strader and Taylor. Johnson explains that he and Strader never spoke or met. He notes that Taylor played no role in the original purchase of the cocaine. Amazingly, Johnson contends that Taylor played no role in distributing the cocaine: he never asked her to help him sell coke, she offered to arrange the deal with Strader on her own, and she lacked the authority to set the price or amount. Johnson claims that "numerous discussions ... pursuant to each transaction" do not amount to a conspiracy, which he conceives of as involving discussions of the origin of the drugs or the distribution plans. He continues by explaining that the parties had no intention to do business in the future or any strong incentives to work together. He suggests that because negotiations surrounded each sale, the parties did not act in league together. In sum, Johnson argues that Taylor's involvement does not turn each sale into a conspiracy.

■ While Johnson cites a number of cases, none lead where he wants us to go. His best case, *United States v. Sullivan*, 903 F.2d 1093, 1098–99 (7th Cir.1990), stands for the proposition that we cannot infer a conspiracy from scant circumstantial evidence. Here, we have Johnson and Taylor agreeing to use Taylor's apartment as the storage depot and processing center for Johnson's sales. We need nothing more. Further-

more, a conspiracy does not need discussions between all parties—this is a classic links-in-a-chain conspiracy, with Taylor assisting Johnson in distributing drugs down the chain. *See United States v. Lechuga*, 994 F.2d 346, 350 (7th Cir.1993) (*en banc*).

■ Second, Johnson claims that the jury lacked sufficient evidence to find him guilty of possession of cocaine. The government indicted Johnson for possession based on the 9 ounces of cocaine found in the search of Taylor's apartment. In a nutshell, Johnson wants us to believe that he could not control or possess the coke—he lacked constructive possession. *See United States v. Soto–Lopez*, 995 F.2d 694, 698–99 (7th Cir.1993). Johnson points to Taylor's lack of credibility, to his own lack of specific knowledge of the precise location of the cocaine in Taylor's apartment, and to Taylor's on-going negotiations with Strader as evidence that he did not control the coke. He quickly passes over Taylor's actual testimony.

Our cases repeatedly establish that actual possession by an underling does not defeat a charge of possession against the chief. The theory of constructive possession allows the conviction of a defendant who "owned" the drugs. *See United States v. Perlaza*, 818 F.2d 1354, 1360 (7th Cir.1987). Taylor testified that the drugs belonged to Johnson and the jury believed it—end of story. *See United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989) (jury is only entity entitled to make credibility determinations).

■ Third, Johnson contends that the court erred by allowing the jury to hear evidence of the controlled buys from Phillips. Johnson alleges that the surveillance evidence of controlled buys did not satisfy the "intricately related doctrine" for admission of uncharged criminal activity. *United States v. Ramirez*, 45 F.3d 1096, 1101–03 (7th Cir. 1995). Without delving into the details of this doctrine, it is adequate to note that the controlled buys were not unrelated criminal conduct—they constituted direct evidence of the distribution conspiracy charged in the indictment and circumstantial proof of Johnson's intent to distribute cocaine in his possession. *See United States v. Bucey*, 876 F.2d 1297, 1315 (7th Cir.1989) (allowing evidence of uncharged criminal activity that involves, explains, or proves the elements of the charged offense).

■ Fourth, Johnson finally hits something solid. He argues that the district court erred by admitting evidence of his 1993 Kansas drug conviction under Federal Rule of Evidence 404(b). Alternatively, even if the evidence was admissible, Johnson argues that it should have been excluded under Federal Rule of Evidence 403.

■ The 1993 conviction itself involved the half pound of cocaine we mentioned earlier which was found in the trunk of Johnson's car (along with a stolen pistol found under the front seat) by a Kansas state trooper in 1993. The government, citing *United States v. Long*, 86 F.3d 81, 84 (7th Cir.1996), argues that because intent to distribute is a specific intent crime, the prior conviction was admissible to prove Johnson's intent. This, of course, is true as a general proposition, but in *United States v. Beasley*, 809 F.2d 1273, 1278–80 (7th Cir.1987), we tried to douse the erroneous belief that other drug offense evidence is *always* admissible under Rule 404(b) in drug prosecutions. It isn't, and this was a rather close case.

■ We review a district court's decision to admit evidence only for an abuse of discretion. *United States v. Curry*, 79 F.3d 1489 (7th Cir.1996). A district judge's determination of the admissibility of evidence "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context to the entire proceeding." *United States v. Torres*, 977 F.2d 321, 329 (7th Cir.1992). Here, Judge Barker found the evidence admissible under Rule 404(b), and not subject to exclusion under Rule 403. Johnson's defense was, essentially, that he did not commit the crimes and that Taylor fabricated her testimony to protect Strader. Therefore, he claimed that the evidence did not show that he and Taylor possessed the cocaine he periodically brought to her apartment with the intent to distribute

it. He also argues that the evidence of 9 ounces of cocaine base which was seized at Taylor's apartment on January 18, 1995, is insufficient to establish it was left by him to be distributed by her to Strader. Given this position, the government argued that Johnson's 1993 possession of a distribution-size quantity of cocaine was probative to illustrate that he knew what was occurring when he gave Taylor the cocaine base with instructions to deliver it to Strader when he arrived. Given our deferential standard of review, we cannot conclude that Judge Barker abused her discretion when she credited this view of why the 1993 cocaine conviction itself was admissible.

■ Although admitting the fact of conviction (and the quantity of the cocaine) was not error, we fail to see the basis for the admission of other evidence stemming from the 1993 episode, particularly Johnson's possession of an illegal firearm and the testimony about Johnson's scuffle with Kansas police officers. Firearms may be tools of the drug trade and thus relevant to a drug charge. *See United States v. Alvarez,* 860 F.2d 801, 829 (7th Cir.1988). But possession of an illegal weapon on a previous occasion is not sufficiently relevant or similar to drug possession on a later occasion for the *Long* rule to apply. As the *Long* court explained, we normally look for some common characteristics linking the prior bad act to the charged offense—these common characteristics must relate to the purpose for which the evidence is offered. 86 F.3d at 84. Here, possession of cocaine at a previous time arguably related, as Judge Barker found, to the government's purpose of proving Johnson's specific intent to possess cocaine with the intent to distribute. But while the cocaine may have sufficient similarity to the charged conduct here, the possession of a stolen 9 mm pistol in 1993 did not help the jury analyze Johnson's intent to possess drugs in 1994 and 1995. The same reasoning applies with even greater force to Johnson's fight with the police.

■ While the admission of these two pieces of evidence was erroneous, we do not believe that it merits reversal. On the contrary, the error was harmless. Johnson's

confession, his voluntary production of the gun in his apartment, Taylor's testimony, and the surveillance testimony add up to overwhelming evidence against Johnson. We have no doubt that even if Judge Barker had excluded all of the challenged 404(b) evidence—rather than just the testimony regarding the handgun and the fight-the jury would still have convicted Mr. Johnson.

■ Next, Johnson claims that the court violated Federal Rule of Criminal Procedure 11(e)(6) by admitting statements made during alleged plea negotiations. Johnson and his former attorney, Moses, as we noted earlier, met with Detective Poikey in January of 1995. Poikey admitted that he discussed immunity for Johnson with a prosecutor before the meeting and, several weeks after the meeting, he prepared a written plea agreement for Johnson. Crucially, however, Poikey claims that he advised Johnson of his *Miranda* rights at the meeting and that no plea agreement was in effect at that time. Moses stated that he and Poikey discussed cooperation extensively, that a prosecutor told Moses that Poikey had the authority to conduct discussions, and that the meeting took place pending formalization of an agreement. Judge Barker ruled that Poikey had no authority to enter into a plea agreement, that Poikey's notes contained no reference to a plea agreement, that Moses' recollections were not credible, and that the subsequent document did not constitute a plea agreement. Therefore, Judge Barker admitted Johnson's statements about the sources of his cutting agent and his false identifications.

We find no error in the admission of this evidence. The court conducted an evidentiary hearing to determine whether or not Johnson made the statements in the course of plea negotiations. We find no error in Judge Barker's determination especially considering the fact that Johnson made his statements to a police officer, not a government attorney. *See United States v. Lewis,* 117 F.3d 980, 984 (7th Cir.), *cert. denied,* —— U.S. ——; 118 S.Ct. 642, 139 L.Ed.2d 620 (1997).

Finally, Johnson alleges he received ineffective assistance of counsel because Moses

failed to sever the felon in possession of a gun charge from the drug charges. Based on *Jones v. Page*, 76 F.3d 831, 840–41 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 363, 136 L.Ed.2d 254 (1996), the government correctly explains that Johnson's cursory allegations do not overcome the strong presumption of effective assistance or the requirement of unfairness in the result.

In sum, we find nothing to merit reversal. AFFIRMED.