In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2638 & 99-2640

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DEBORAH WALTON
and KENNETH MARSALIS,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 320--John F. Grady, Judge.

Argued April 12, 2000--Decided June 14, 2000

Before CUDAHY, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.  On June 4, 1998,
Defendants-Appellants Deborah Walton ("Walton")
and Kenneth Marsalis ("Marsalis") were indicted
and charged in a two count indictment, charging
each of them with conspiring to carry and take
away and carrying and taking away, with intent to
steal, approximately $90,500.00 from a Citibank
branch's automatic teller machine ("ATM")./1
Walton and Marsalis were both convicted on each
count by a jury, and their separate motions for
a new trial were summarily denied. The court on
June 17, 1999 sentenced Walton to ten months'
imprisonment on each count and ordered each of
her sentences to run concurrent with each other.
The court sentenced Marsalis to twenty-seven
months' imprisonment on each count, and also
ordered each of his sentences to run concurrent
with each other. Each of them were also sentenced
to three years supervised release and ordered to
pay restitution in the amount of $90,500.00. The
court directed that the order of restitution be
paid jointly and severally by Walton, Marsalis
and Golliday.

  Marsalis appeals, arguing that the judge: (1)
erred when he found that the government's
peremptory strike of a prospective juror was not
based on racial discrimination; (2) abused his

discretion when he excluded evidence regarding a similar ATM theft at the same location that occurred just four months prior to the instant offense and (3) abused his discretion when he denied his motion for a new trial based on the government's failure to produce the remaining telephone records that he requested until the second day of trial. Walton also appeals, arguing that the court committed error when in its restitution order, it directed that she be held jointly and severally liable for the full amount of restitution. We AFFIRM Marsalis' conviction and sentence, AFFIRM Walton's conviction, and REVERSE AND REMAND Walton's sentence with respect to the order of restitution.

## I.  BACKGROUND

At approximately 10:32 p.m. on June 7, 1996, Marsalis, Walton and Golliday drove in separate cars to the Citibank branch located at 8650 South Stony Island in Chicago, Illinois, to commit a theft from the bank's drive-up ATM. Acting as the "look-out," Walton parked her car nearby so that she could flash her headlights as a warning should she observe anything that might interfere with the execution of the crime as planned. According to the plan, Golliday entered the bank's premises to access the bank's interior ATM and engaged the bank security guard in conversation and distracted him, claiming that she was having trouble retrieving money from the machine. With the guard's attention diverted to Golliday's problem, Marsalis drove-up to the ATM located outside the bank, gained entry into the machine and stole approximately $90,500.00.

The theft was not discovered until the next morning when a bank security guard noticed that the drive-up ATM door was open. The FBI and the company responsible for replenishing the ATM, Wells Fargo, discovered upon investigation that the evidence pointed to an "inside job" as there were no signs of forcible entry into the ATM and the ATM's burglar alarm system was turned off. Also, the bank's surveillance video tapes were reviewed and revealed that about the time of the theft, Golliday can be observed on the video in the interior ATM area occupying the attention of the bank security officer and focusing her eyes in the direction of the drive-up ATM. Still photos of Golliday were taken from the video tape and copies of her picture were distributed throughout the local Wells Fargo branch that was responsible for servicing the ATM. Thereafter, a secretary at Wells Fargo recognized Golliday as a former Wells Fargo employee, resulting in Golliday being arrested and charged with the theft.

When FBI agents questioned Golliday about the crime, she readily confessed to her involvement in the episode, agreed to cooperate and identified the other partners involved as Marsalis and Walton, both of whom were also former Wells Fargo employees. She went on to describe how they jointly planned and carried out the heist and based on this information, Marsalis and Walton were arrested. Prior to issuing the indictment and upon request by the government, the grand jury issued a subpoena for various telephone records, including the home phone records of Marsalis, Walton and Golliday which reflected an unusually high number of calls placed between the defendants on the day of the theft. Prior to trial, defense counsel requested and the government produced the subpoenaed telephone records, but neglected to produce the phone records relating to the government's investigation into a prior ATM theft at the same address that occurred just four months earlier. After another request by defense counsel for these particular records, the prosecution turned over the remaining phone records on the second day of trial.

During jury selection, the government exercised a peremptory strike upon a prospective African-American juror, explaining that they based their strike on her "inattentiveness" during the proceedings. In an attempt to ascertain whether the government's strike was race-neutral in light of the fact that both Marsalis and Walton are also African-American, the court sua sponte conducted a voir dire concerning the asserted reason given by the government in support of its strike. In response, the government offered the testimony of the FBI agent assigned to the case whose observations formed the basis of the government's strike. After hearing the case agent's testimony and the arguments of counsel, the court concluded that the government's peremptory strike of the juror was race-neutral.

At trial, Marsalis and Walton offered to introduce evidence relating to the February 1996 unsolved ATM theft but the court refused to admit the offer, ruling that it was irrelevant and might conceivably be prejudicial to the defendants as it might serve to suggest that the defendants also committed the unsolved ATM theft. Following their convictions, Marsalis filed a motion for a new trial based on the government's tardy production of the missing phone records, which was in turn denied by the court. As previously mentioned, the court proceeded to sentence Walton and Marsalis to ten and twenty-seven months' imprisonment respectively, and held Walton, Marsalis and Golliday each jointly and

severally liable for restitution in the amount of $90,500.00. Marsalis and Walton appealed.

## II.  ISSUES

On appeal, Marsalis claims that: (1) the judge erred when he found that the government's peremptory strike of the African-American juror was not pre-textual for racial discrimination; (2) the court abused its discretion when it excluded evidence of a prior ATM theft at the same location that occurred four months prior to the instant offense; and (3) the court abused its discretion when it denied the defendant's motion for a new trial despite the government's failure to produce the remaining telephone records until the second day of trial. Walton on appeal argues only that the court erred when it held her jointly and severally liable for the full amount of the restitution.

## III.  DISCUSSION

### A.  Marsalis' Batson Challenge

Marsalis initially argues that the court erred when it ruled that the government's peremptory strike of a prospective African-American juror based on her "inattentiveness" during the proceedings was proper. Specifically, Marsalis contends that the court "clearly erred by failing to perform a thorough analysis of whether [the] stricken juror . . . was treated differently from similarly-situated prospective jurors," and thus, the prosecution's strike was actually based on race. Under Batson v. Kentucky, 476 U.S. 79, 96-98 (1986), allegations of racially-based peremptory challenges are evaluated under a three-part analysis: (1) the defendant must make a prima facie showing that the government exercised the challenge because of race; (2) the government must next proceed to articulate a race-neutral reason for the challenge; and thereafter (3) the court must determine whether the defendant has carried his burden of proving purposeful discrimination. See Morse v. Hanks, 172 F.3d 983, 985 (7th Cir.), cert. denied, 120 S. Ct. 129 (1999). Because both Marsalis and the government concede that the first two steps were satisfied, we turn our focus to the third step. United States v. Evans, 192 F.3d 698, 699-700 (7th Cir. 1999) ("[T]he trial judge's finding that the government offered a race-neutral explanation . . . moots the preliminary question whether [the defendant] established a prima facie case of discrimination.")

Under the third step of the analysis (whether the defendant has carried his burden of proving purposeful discrimination), "the persuasiveness

of the justification becomes relevant" and "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curium). Thus, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." United States v. Marin, 7 F.3d 679, 686 (7th Cir. 1993) (brackets in original) (citing Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion)).

The court sua sponte conducted a voir dire of the government's asserted reason for the strike and received the testimony of the assigned FBI case agent whose observation formed the basis of the government's peremptory strike. When asked to describe the "inattentiveness" of the stricken juror and compare her with the other jurors he had an opportunity to observe, the agent testified:

THE FBI AGENT: Specifically what I noticed was her . . . staring out . . . [the] window and not looking back over at the Judge when he was speaking . . . .
. . .

THE COURT: Did this juror in terms of her attentiveness or inattentiveness strike you as acting differently from the other 13 jurors you could see in the box?

THE FBI AGENT: Yes, sir. I think that is why I noticed her. I had nothing else to do at the time but observe what I could, and . . . everyone else was slanted towards you even if they had to turn their chairs, and she was facing the other way, which is why I initially noticed her.

After considering the testimony of the case agent regarding his observations of the stricken juror and the other prospective jurors, as well as the arguments of counsel, the judge was convinced that the government's peremptory challenge was race-neutral:

There can be no doubt that inattentiveness is a legitimate basis for challenging a juror. If anything is required of a juror aside from impartiality, it is the willingness and ability to pay attention and retain what is seen and heard during the trial. So inattentiveness is a major objection of the most legitimate kind to a juror who displays that characteristic. . . . Considering all the circumstances, I conclude that the defendants have failed to carry their burden of proving that the government's reason for challenging [the juror] is motivated in any degree by race.

Contrary to Marsalis' assertions, the record is clear that the judge engaged in an exhaustive inquiry into the government's peremptory strike of the African-American juror. See Coulter v. Gilmore, 155 F.3d 912, 921 (7th Cir. 1998). We also are convinced that Marsalis failed to carry his burden of establishing that the government's peremptory strike was motivated by race because a juror's inattentiveness during the proceedings is a valid, race-neutral basis for executing a peremptory strike. See, e.g., United States v. Changco, 1 F.3d 837, 840 (9th Cir. 1993) (holding that inattentiveness is a proper race-neutral basis for striking a juror); United States v. Garrison, 849 F.2d 103, 106 (4th Cir. 1988) (holding that striking a juror because she appeared "inattentive or uninterested" did not violate Batson). Thus, in light of the court's thorough review and fact-finding, our deference to "[t]he trial court's determination about the ultimate question of discriminatory intent," and the absence in the record of any evidence to support the defendant's claim, we conclude that there was no error, much less clear error, in the court's finding that the government's strike of the African-American juror was race-neutral. See Evans, 192 F.3d at 700.

## B.  Marsalis' Evidentiary Challenge

We next turn to Marsalis' claim that the court abused its discretion when it excluded the reception of evidence dealing with an unsolved ATM theft from the same bank that occurred just four months prior to the date of the instant offense. We review a trial judge's determination of the admissibility of evidence under the abuse of discretion standard. See United States v. Johnson, 137 F.3d 970, 974 (7th Cir. 1998). "We afford great deference to the trial court's determination of the admissibility of evidence because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding." United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998). Indeed,

"[a]ppellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle." United States v. Coleman, 179 F.3d 1056, 1061 (7th Cir. 1999) (internal quotations omitted) (brackets in original). Because we give "special deference" to the rulings of the trial judge[,] [a defendant]

obviously "carries a heavy burden." Palmquist v. Selvik, 111 F.3d 1332, 1339 (7th Cir. 1997). In this context, we will not reverse unless "the record contains no evidence on which [the district court] rationally could have based [its] decision, or where the supposed facts found are clearly erroneous." Id. (internal quotes omitted). Moreover, if an error in the admission or exclusion of evidence was committed during the trial, the court will grant a new trial only if the error had a "substantial influence over the jury," and the result reached was "inconsistent with substantial justice." Id. (internal quotes omitted).

Agushi v. Duerr, 196 F.3d 754, 759 (7th Cir. 1999).

Sometimes referred to as "reverse 404(b)" evidence, "[e]vidence regarding other crimes is admissible for defensive purposes if it 'tends, alone or with other evidence, to negate [the defendant's] guilt of the crime charged against him.'" Agushi, 196 F.3d at 760 (quoting United States v. Stevens, 935 F.2d 1380, 1404 (3d Cir. 1991)). But of course, a court "should balance the evidence's probative value under Rule 401 against considerations such as prejudice, undue waste of time and confusion of the issues under Rule 403." Id.

Here, the court concluded, and we agree, that the evidence regarding the unsolved February 1996 ATM theft was irrelevant because it was unsolved and occurred four months prior to the instant theft and neither tended to prove nor disprove the defendants' involvement in the charged offense, and also that the evidence might conceivably be interpreted as prejudicial to the defendants because it might have suggested to some that the defendants also committed the unsolved ATM theft:

[U]nless there is evidence tending to show that [the defendants] were not involved in the February occurrence, all this evidence that you propose to offer would suggest that somebody, including [the defendants] as a very real possibility, committed a similar offense back in February. That doesn't tend to show that they are not guilty of the offense charged here.

(Emphasis added).

Because "we give great deference to the district court's evidentiary rulings" and because of the obvious lack of relevance and prejudicial nature of the evidence relating to the unsolved ATM theft, we are convinced that the trial judge did not abuse his discretion in excluding this

evidence. See United States v. Mancillas, 183 F.3d 682, 705 (7th Cir. 1999), cert. denied, 120 S. Ct. 1271 (2000).

## C. Marsalis' Motion for a New Trial

Turning to Marsalis' claim that the court abused its discretion when it denied his motion for a new trial, Federal Rule of Criminal Procedure 33 provides that "[o]n a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." We review a court's decision to deny a new trial for abuse of discretion. See United States v. Williams, 81 F.3d 1434, 1437 (7th Cir. 1996).

Specifically, Marsalis contends that he was entitled to a new trial because the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to turn over all of the phone records that were subpoenaed in a timely fashion. In order for the defendant to be entitled to a new trial as a result of an alleged Brady violation, he must establish that: (1) the prosecution suppressed evidence; (2) the evidence allegedly suppressed was favorable to the defense; and (3) the evidence was material to an issue at trial. See United States v. Hartbarger, 148 F.3d 777, 786 (7th Cir. 1998), cert. denied, 119 S. Ct. 1117 (1999). Under the third prong, evidence is material only if there is a "reasonable probability" that the disclosure of the allegedly suppressed evidence would have changed the result of the trial. United States v. Silva, 71 F.3d 667, 670 (7th Cir. 1995). A "reasonable probability" exists if the suppression of evidence undermines confidence in the outcome of the trial. See id. Because we conclude that the third step of the analysis is dispositive, we turn our attention to whether there is a "reasonable probability" that timely disclosure of the missing phone records would have changed the result of Marsalis' trial.

Here, Marsalis has failed to establish how the timely disclosure of the missing phone records relating to the unsolved ATM theft impacted his trial because the records became immaterial at the moment the judge excluded any evidence that related to the government's investigation into the unsolved ATM theft. But even if the missing phone records could properly be classified as material (i.e., exculpatory evidence), these records were turned over on the morning of the second day of trial, well before the prosecution had finished presenting its case. In spite of Marsalis' claim that he was harmed by the government's delayed production, it is

interesting to note that he failed to move for either a continuance, an adjournment or a mistrial. See, e.g., United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996) ("Disclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material. . . . If counsel needed more time, she had only to ask; yet she did not seek a continuance. Nothing more need be said."); United States v. Williams, 738 F.2d 172, 178 (7th Cir. 1984) ("[O]ur standard of review limits us to determining whether the government's disclosure came so late as to prevent appellant from receiving a fair trial. We cannot say that disclosure came too late in this case. After appellant's counsel viewed the reports at trial, he could have asked for a continuance to contact the other owners and call them to testify, or he could have asked the court to make the reports part of the record.") (citations omitted). Thus, we are of the opinion that the government's delayed disclosure of the remaining phone records did not come so late as to deny Marsalis of the evidence's "effective use" at trial, had he chosen to do so.

Accordingly, we are not convinced that there is a "reasonable probability" that the outcome of his trial was prejudiced by the government's alleged delayed production of the immaterial phone records. We conclude that the trial judge did not abuse his discretion in denying Marsalis' motion for a new trial based on the alleged Brady violation.

D. Walton's Challenge to the Restitution Portion of her Sentence

Lastly, the government concedes, as Walton has asserted, that the district court committed plain error because according to the transcript of the proceedings, the court was under the mistaken impression that it was "required" to order her jointly and severally liable for the entire amount of the restitution of $90,500.00./2 At the conclusion of Walton's sentencing hearing, the court ordered:

THE COURT: A condition of the supervised release is that she make restitution. I think I am required to impose the full amount these days; is that correct?

[Marsalis' Attorney]: Yes, your Honor.

[The Government]: You are Judge.

THE COURT: 90,000 and how many dollars?

[The Government]: 500.

    THE COURT: $90,500 within the period of supervised release. . . .

(Emphasis added). Walton contends that under the law, the court was not "required to impose the full amount," but instead, had the option of apportioning the restitution amount among the defendants and weighing factors into the fixed restitution figure, such as her "contribution to the victim's loss" and her "economic circumstances."

    Under the Mandatory Victim Restitution Act ("MVRA"), enacted in 1996, a court must award the full amount of restitution to each victim of a property crime. See 18 U.S.C. sec. 3663A(a)(1), (c)(1)(A)(ii); sec. 3664(f)(1)(A). The MVRA "does not permit a district court to exercise discretion as to whether it imposes restitution upon a defendant; the statutory language clearly states that it must." See United States v. McIntosh, 198 F.3d 995, 1004 (7th Cir. 2000). The statute also provides that where more than one defendant has contributed to the victim's loss, the court may make each defendant liable in full or "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. sec. 3664(h)./3

    Because the MVRA affords the sentencing court discretion in apportioning liability where multiple defendants are involved, our previous holdings interpreting the Victim Restitution Act remain instructive here. In McIntosh, we stated that because "the Victim Restitution Act provides district courts with discretion when ordering restitution," when a court "chooses to impose an order [of restitution] and simultaneously waives a fine because of the defendant's economic circumstances," an explanation of its reasoning is necessary. McIntosh, 198 F.3d at 1004.

    Thus, when a court orders restitution under 18 U.S.C. sec. 3664(h) but the record fails to "sufficiently support [the court's] conclusions or clarify its reasoning, then we ask that the court provide us with that information, including its specific findings of fact, to facilitate our review." United States v. Menza, 137 F.3d 533, 538 (7th Cir. 1998); cf. United States v. Boula, 997 F.2d 263, 269 (7th Cir. 1993).
    Upon review of the judge's statements in the record, we are not convinced that the court was aware that it had the option of either ordering Walton liable for the full amount of the restitution or apportioning her liability to reflect the level of Walton's contribution to the

victim's loss and her economic circumstances./4 We also are left in limbo and can only speculate as to why the court waived Walton's fine and the interest "due to [her] financial inability to pay" and ordered her restitution payments to be made "in monthly installments equal to 10% of her monthly cash flow," but for reasons unexplained, chose not to apportion her liability based upon her economic circumstances as it had the authority to do so under 18 U.S.C. sec. 3664(h).

Thus, we vacate and remand the restitution portion of Walton's sentence and ask the court to make clear that it has considered whether Walton should be liable "for payment of the full amount of restitution" or for an apportioned amount "reflect[ing] [her] level of contribution to the victim's loss and economic circumstances." 18 U.S.C. sec. 3664(h). We leave to the judgment of the court to determine whether our aforementioned conclusions warrant a reevaluation of the restitution portions of Marsalis' and Golliday's sentences as well.

In conclusion, we agree that the trial judge did not abuse his discretion when he found that the government struck the African-American juror for race-neutral reasons, precluded evidence of the unsolved February 1996 ATM theft and denied Marsalis' motion for a new trial. We vacate the restitution portion of Walton's sentence and remand the case to the trial court to make specific its findings in support of its order of restitution, while also considering whether or not she should be held liable for the full amount of restitution or for an amount reflecting her contribution to the victim's loss and her economic circumstances, and whether the restitution portion of Marsalis' and Golliday's sentences should also be reevaluated. Accordingly, we AFFIRM Marsalis' conviction and sentence, AFFIRM Walton's conviction, and REVERSE only with respect to Walton's restitution order and REMAND the sole issue of restitution to the district court for proceedings consistent with this opinion.

AFFIRMED IN PART,
REVERSED IN PART AND
REMANDED WITH INSTRUCTIONS.

/1 One Larita Golliday ("Golliday") was also named and charged in both counts of the indictment, pled guilty pursuant to a plea agreement and cooperated with law enforcement authorities in the investigation and prosecution. The court sentenced Golliday to two years probation on Count one and found her, along with Marsalis and

Walton, jointly and severally liable for the total amount of the restitution. On motion of the government, the court dismissed Count two of Golliday's indictment.

/2 The government and Walton agree that Walton's attorney's forfeited this argument on appeal by failing to raise the issue to the court's attention at sentencing, but the respective parties also agree that the error is serious enough to constitute plain error and warrant remand of the restitution portion of Walton's sentence.

/3 The MVRA also provides that upon determination of the amount of restitution owed to each victim, the court must specify in the restitution order the manner and schedule in which the restitution is to be paid, taking into consideration the "financial resources and other assets," "projected earnings and other income" and "any financial obligations of the defendant." 18 U.S.C. sec. 3664(f)(2). Indeed, the court may even "direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C. sec. 3664(f)(3)(B).

/4 But we also feel obligated to point out that the government and the respective counsel for each of the defendants contributed to the sentencing court's mis-apprehension. In response to the court's inquiry, "I think I am required to impose the full amount [of restitution] these days; is that correct?", the government and Marsalis' attorney each replied in the affirmative, while Walton's attorney remained silent. Nonetheless, because both the government and Walton agree that the court's error was plain and the record reflects the same, we grant remand.